T. C. MORROW

v.

**AMERICAN BANK & TRUST COMPANY.**

Civ. A. No. 71–285.

United States District Court,
M. D. Louisiana.

July 11, 1975.

---

Boris F. Navratil, Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiff.

Neil H. Mixon, Jr., Dean M. Mosely, McCollister, Belcher, McCleary & Fazio, Baton Rouge, La., for defendant.

E. GORDON WEST, District Judge:

The plaintiff, Mr. T. C. Morrow, was indebted to the defendant, American Bank & Trust Company (the Bank), in the sum of $2,492,552.30. This indebtedness was represented by three promissory notes executed by Morrow in favor of the Bank, and was secured by the pledge by Morrow to the Bank of certain shares of stock of the Continental Bank of Houston, Texas and the Planter's Bank & Trust Co. of Opelousas, Louisiana. When the notes were not paid at

maturity, the bank, without appraisement or notice, sold the pledged stock at private sale to satisfy the indebtedness. Out of the proceeds of the sale the bank retained $2,492,552.30, the full amount of the indebtedness of Morrow, paid its attorneys, McCollister, Belcher, McCleary and Fazio (hereafter referred to as "McCollister") the sum of $249,255.23, representing the 10 per cent attorney fee provided for in each of the three notes involved, and remitted to McCollister the sum of $80,792.47 for the account of Mr. Morrow, representing the balance of the sales price of the stock. Subsequent to the disbursement of these funds, and pursuant to a compromise agreement between Morrow, the Bank, and McCollister, the McCollister fee was reduced to $130,047.70, increasing the payment to Morrow to $200,000.00. After these adjustments were made this suit was filed by Mr. Morrow seeking to recover the amount of the fee ultimately paid McCollister on the ground that there was never a need for the Bank to place the notes in the hands of an attorney for collection and that in fact the notes were never really placed in McCollister's hands for collection. The Bank defends on the ground that when the notes were not paid at maturity, and when they delivered the notes to their attorneys for handling, 10 per cent of the face amount of the principal and interest immediately became due and owing as liquidated damages by the term of the notes, and secondly, that since the final amount that was paid as attorneys' fees was arrived at by a valid compromise between the parties, that compromise is res judicata to the claim now being urged by the plaintiff. This case was tried to the Court without a jury, and now, after due consideration of the evidence adduced at the trial, and after due consideration of the arguments of counsel, the Court concludes that the plaintiff cannot prevail in this case. In connection with this holding the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The three notes involved in this litigation, and which were executed by the plaintiff, T. C. Morrow, payable to the American Bank & Trust Company, are briefly described as follows:

(1) A note dated December 9, 1969, in the amount of Six Hundred Forty-Eight Thouand and No/100 Dollars ($648,000). Payable on demand. This note was secured by the pledge of 43,973 common stock shares of Continental Bank of Houston, Texas.

(2) A note dated January 3, 1970, in the amount of One Million Eight Hundred Eighty-Four Thousand Four Hundred Sixty-Five and No/100 Dollars ($1,884,465). Due on its face on July 1, 1970. This note was secured by the pledge of 16,797 common stock shares of Planter's Bank & Trust Co. of Opelousas, Louisiana.

(3) A note dated August 1, 1970, in the amount of Thirty-Two Thousand Three Hundred Fifty-Nine and 14/100 Dollars ($32,359.14). Due on its face Sept. 1, 1970. This note represented interest due on note (2) through July 1, 1970. It was secured by the same Planter's Bank common stock pledged to secure note (2).

Each of these notes contained the following pertinent provisions:

"The makers . . . of this note, hereby severally waive presentment for payment, demand, protest and notice of protest and non-payment, . . . consent to all extensions hereof . . ."

\* \* \* \* \* \*

"In case of non-payment of this note at its maturity, or when otherwise due, as herein provided, . . . to the said bank, when due or demandable, the said bank . . . is hereby irrevocably authorized to sell said securities . . . or any part thereof, at public or private sale without recourse to judicial proceedings, and

without either demand, appraisement, advertisement or notice of any kind, . . . at their market value, and said bank, . . . is hereby irrevocably authorized to make any transfers or deliveries to the purchaser or purchasers at such public or private sale of any securities . . . herein pledged, and to apply the proceeds thereof (1) to the payment of all costs and commissions for selling; (2) to the payment of this note in principal, interest and ten per cent (10%) attorneys' fees, . . . as below stipulated . . ."

    *     *     *     *     *     *

"In the event that this note . . . due by the undersigned, . . . to said bank, be placed in the hands of an attorney-at-law for collection, attorneys' fees hereby fixed at 10 per cent (10%) . . . and secured by the pledge hereof shall be due thereon."

The genesis of Note (2), the one for $1,884,465.00, was a note in the amount of $1,848,165.00 which plaintiff executed in favor of the Bank on July 3, 1967. This was a six month note. When it became due, plaintiff paid accrued interest and executed a new six month note for the principal balance. This procedure was followed for several years. In some instances plaintiff paid off his notes, but usually they were simply renewed. The usual procedure was for the Bank to send plaintiff a renewal note, whereupon plaintiff would sign it and return it together with his check for accrued interest to the Bank. The Bank would then cancel the prior note by stamping it "PAID BY RENEWAL," and send the cancelled note to plaintiff. Cancellation of the matured notes generally occurred seven to twelve days after the date of maturity, due to ordinary mailing delays.

On June 24, 1970, the Bank's Senior Vice-President, Mr. Max Pace, wrote plaintiff acknowledging receipt of payment of a note not connected with this suit, but in that letter Mr. Pace said:

"This leaves two notes with us *due July 1, 1970,* and totalling $2,446,361.-00. The amount of interest accumulated as of that date will be $33,756.-24.

"It is requested that you meet with us as soon as possible in order that we may discuss these loans." (Emphasis added.)

This letter obviously was referring to Note No. (1), described above, which was, by its terms, due "On Demand" and to Note No. (2), described above, which was, by its terms, due on July 1, 1970. It is the Bank's contention that this letter operated to make the demand note due and payable on July 1, 1970. This Court agrees that the letter did in fact have that result.

On or about June 30, 1970, the Bank learned that various creditors of the plaintiff had met and were to meet again to discuss financial difficulties which had befallen the plaintiff. Problems had developed concerning his cash flow. It developed that he had been paying the interest on notes (1) and (2) with Ashland Oil Company stock dividends, and when payment of these dividends was suspended by that company, he was unable to make the interest payments necessary in order to renew the two large notes now due on July 1, 1970.

No further action was taken by the Bank until July 29, 1970, when Mr. Pace agreed orally with the plaintiff to withhold collection efforts on notes (1) and (2) until September 1, 1970, and further agreed to send plaintiff note (3) for his signature, payable to the defendant, representing interest accrued on note (2) from January 3, 1970, through July 1, 1970. This note was mailed to plaintiff for his signature on July 30, 1970, and was returned to defendant duly signed on August 6, 1970.

On September 1, 1970, unknown to the defendant Bank, plaintiff filed a petition for reorganization under Chapter

11 of the Bankruptcy Act · in United States District Court in Houston, Texas. Plaintiff had not communicated with the defendant since remitting note (3) on August 6, 1970. Plaintiff made no requests to renew the notes, and there is no question but that he then understood that all three notes in question were due and payable on September 1, 1970, the day he filed his petition for reorganization.

That very day, Mr. Max Pace met with other officers of the Bank and the decision was made to protect the interest of the Bank by selling the stock that plaintiff had pledged as security for the three notes. There is no doubt but that the Bank knew that a Mr. Veil David DeVillier was anxious to buy this stock if it became available, and there is no doubt but that the Bank so advised their attorney, Mr. Rolfe H. McCollister, who was also a member of the Board of Directors of the Bank. The Bank turned the notes and stock over to Mr. McCollister either after the close of business on September 1, 1970, or on the morning of September 2, 1970, with instructions to effect collection of the notes by sale of the pledged stock. It is quite probable that Mr. McCollister was actually instructed to consummate a sale of the stock to Mr. DeVillier. In any event, it took no more than a phone call by Mr. McCollister to Mr. DeVillier for Mr. McCollister to know that the purchaser of the stock would be Mr. DeVillier. This does not mean, however, that much additional work was not required of Mr. McCollister before the sale and transfer of the stock was finally completed. The sale of the pledged stock to DeVillier was consummated on the afternoon of September 2, 1970, for a total price of $2,822,600.00. Among other things, the Bank agreed to hold DeVillier harmless on any loss he might sustain on a $350,000.00 loan to plaintiff at the Planter's Bank & Trust Co. in Opelousas, Louisiana, and the Bank also agreed to repurchase the Continental Bank stock for itself or for an assignee for the same price DeVillier was paying for it, $622,600.00. McCollister's law firm handled the negotiations, the drafting of the act of sale and the hold harmless agreements, and all other legal documents required. The DeVillier purchase was financed by loans from the Bank. This private sale of the securities resulted in the receipt and disbursement of monies as follows:

Receipts:

| | | |
|---|---|---|
| Purchase price received | | $2,822,600.00 |
| (Planter's stock | 2,200,000) | |
| (Continental stock | 622,600) | |

Disbursements:

| | |
|---|---|
| Principal and interest owed to and paid to the Bank | 2,492,552.30 |
| 10% attorneys' fees paid to McCollister as per provisions of notes | 249,255.23 |
| Excess funds from sale for account of plaintiff, T. C. Morrow | 80,792.47 |
| Total paid out | $2,822,600.00 |

The money representing the attorneys' fees and the balance due the plaintiff was paid to the McCollister firm by cashier's check on September 3, 1970, and deposited to their clients' account on September 10, 1970.

On September 2nd or 3rd, 1970, Mr. Jarrell D. McDaniel, plaintiff's attorney in Houston, Texas, learned that a sale of the pledged securities had occurred after the petition for the Chapter 11 arrangement proceedings had been filed on September 1, 1970. On plaintiff's behalf, he immediately filed a petition for a stay order to temporarily enjoin a transfer of the pledged stock to DeVillier, and to temporarily enjoin application of the proceeds of the sale of plaintiff's stock to any of his other debts. The order was signed September 4, 1970, by the Honorable Arthur L. Moller, Referee in Bankruptcy, in Houston, Texas.

On September 9, 1970, Messrs. Pace and McCollister appeared in Houston, Texas, at the show cause hearing ordered by Judge Moller. The proceeding focused upon the validity of the sale of

the pledged stock, and upon an accounting of the proceeds thereof. Mr. McDaniel was obviously concerned about the fact that the proposed disbursement of funds would result in a cash payment to plaintiff of only a little over $80,000.-00, when his equity in the stock was over $340,000.00. This concern was evidenced by his questioning of the plaintiff:

Mr. McDaniel: "Mr. Morrow, based on an indebtedness to the bank of $2,492,000, in your opinion—well, let's don't use your opinion, based on a sale at $2,822,000, you would have approximately $340,000 equity in that stock?"

Mr. Morrow: "That's correct."

Mr. McDaniel: "In connection with the arrangement which is now pending, is it necessary that you have available to you soon a sum of cash in order for you to operate your oil and gas producing properties and to maybe—not absolutely necessary, but would be important that this sum of money be turned over to you in order to make your arrangement proceeding successful?"

Mr. Morrow: "That's correct."

The reduction in plaintiff's equity to a little over $80,000.00 was, of course, caused by the proposed attorney fee payment to McCollister.

A recess was taken in the hearing, whereupon Mr. McCollister and Mr. McDaniel went into the hall to discuss the possibility of a settlement. Mr. McDaniel was of the opinion that the Bankruptcy Court had no jurisdiction to force McCollister's law firm to give back to plaintiff the $249,255.23 attorneys' fee. He did not question the validity of the fee, but merely suggested that a reduction in the amount of the fee could be a "vehicle for settlement." Accordingly, in the spirit of compromise, Mr. McCollister agreed to reduce the attorneys' fee received by his firm from the above figure to $130,047.70, whereby plaintiff would receive $200,000.00 cash

from the sale proceeds, instead of the $80,792.47 originally contemplated. Mr. McDaniel in turn agreed to move the Court to lift the stay order, thus permitting the transfer of the stock to De-Villier and the disbursement of the funds as agreed upon. This was done on September 10, 1970. Mr. McDaniel now says that he did not agree to this settlement to "settle all matters" between the parties, but merely to surrender "maintenance of the status quo" to get the $200,000.00. He now contends, as does the plaintiff, that this compromise was not intended to settle the question of the validity of any payment of fee to McCollister. Conversely, Mr. McCollister contends that the compromise was a complete "settlement of differences in the whole affair," and that "absolutely no misrepresentations had been made in Houston." We agree with the contention of Mr. McCollister and conclude that this version is supported by the record in the show cause hearing. When the show cause hearing reconvened, the following agreement was read into the Court record:

The Court: "Be seated, please."

Mr. McCollister: "Your Honor, we have reached an agreement. I'd like for Mr. McDaniel to state it and then I will add to it if necessary, not to correct him but maybe to add my impression."

Mr. McDaniel: "I think it will be necessary probably.

"We have agreed, your Honor, that in settlement of the controversy involved herein, that Mr. Morrow as a debtor in possession, subject to the approval of the Court would receive the sum of $200,000 out of the consideration received for the sale of the Planter's Trust and Savings Bank stock and the Continental Bank, Houston stock. And, in return for so doing, the temporary stay order now in effect would be dissolved. And the mechanics would be that the stock would be— in the Planter's Trust and Savings

Bank, would be presented tomorrow to Mr. _____ the President of the Planter's Trust and Savings Bank for transfer, and, at the time that is presented, they will present to Mr. Ardroin a cashier's check in the sum of $200,000 payable to T. C. Morrow, debtor in possession."

The Court: "All right."

Mr. McDaniel: "And, that Mr. _____ would go ahead and forward that check to Mr. Morrow, and would go ahead with the transfer and thereafter, they of course, would be authorized to present the Continental Bank stock for transfer, also."

Pursuant to this agreement a cashier's check in the amount of $200,000.00 was issued by the Bank on September 10, 1970, to T. C. Morrow, Debtor in Possession. The check was deposited by plaintiff as debtor in possession on September 14, 1970.

## CONCLUSIONS OF LAW

Plaintiff is a citizen of Houston, Texas. Defendant is a Louisiana Banking Corporation having its principal place of business in Baton Rouge, Louisiana. Jurisdiction is conferred by 28 U.S.C. § 1332.

■ Plaintiff maintains that invocation of the attorneys' fee provisions contained in the notes was not necessary because the Bank had a willing purchaser available for the pledged stock and that it was thus not necessary for the Bank to turn the notes over to an attorney for collection. In support of this contention plaintiff cites *Guaranty Bank & Trust Co. v. Quad Drilling Corp.*, 284 So.2d 351 (La.App. 1st Cir. 1973), for the proposition that provisions for attorneys' fees included in promissory notes are not enforceable unless it appears that, when the obligation matures, the employment of counsel is necessary to safeguard the creditor from incurring a loss. In *Quad Drilling*, a claim was made upon the estate of a deceased for acknowledgement and payment of a debt incurred by the deceased's endorsement of a promissory note. The obligation was past due, and, unlike the present case, the note there involved provided for 25 per cent attorneys' fees . . . "on the amount sued for, or recovered without suit, by sale or collection of the securities, in case of suit or legal services in or out of court." The claim was timely acknowledged and payment was duly tendered to the holder of the note. The tender of payment was refused because of a dispute as to whether or not attorneys' fees were due in accordance with the provisions of the note. The Court of Appeals, in reversing the district court's judgment awarding attorneys' fees, said that "(u)nder the circumstances, there was no real necessity for employing an attorney to collect the amount due from the succession representatives," since they had acknowledged the claim and had agreed to pay it within thirty days from submission, as required by law. The court in *Quad Drilling* referred to *Holstead v. Lewis*, 160 So. 834 (La.App. 2nd Cir. 1935), regarding the "necessity" for employing an attorney for collection, where it was stated:

"It must appear that the status of things, when the obligation matures, is such that the incurring of the fee by employment of counsel to collect the obligation or to closely watch matters to insure collection eventually is justified." Id. at p. 837.

However, in *Lagarde Finance Company v. Vinet*, 346 F.2d 846 (CA 5—1965), the United States Fifth Circuit Court of Appeals awarded attorneys' fees to a finance company out of the proceeds of certain life insurance policies that were assigned to the finance company to secure a promissory note executed by the deceased, where the note in question contained an attorneys' fee proviso exactly as the notes in the instant case. The Court reviewed the Louisiana jurisprudence and discussed *Holstead, supra*:

"Holstead v. Lewis was a situation in which the holder of a demand note led

the debtor's administrator to believe that she would not expect immediate payment even though the obligation was mature. Then, without notifying the debtor of her desire to terminate the period of indulgence, the holder demanded attorney's fees and turned the note over to an attorney for collection. The Louisiana court concluded that the holder, having sanctioned nonpayment of a mature obligation, was estopped to enforce the attorney's fee provision without first notifying the debtor of his change of heart."

\*    \*    \*    \*    \*    \*

"Furthermore, the note in Holstead provided for attorney's fees 'incurred' in the collection of the note. In order for the holder to sustain her burden of proving that the fees were 'incurred,' it was incumbent on her to show that it was necessary for an attorney to undertake action to collect the obligation. In the instant case there was no requirement that the expenses be incurred, but merely that the note be placed in the hands of an attorney for collection." *Id.* at p. 850.

We consider *Lagarde* as controlling in the case before us. The language of the notes is clear and unambiguous. They each provided that "(i)n the event that this note \* \* \* be placed in the hands of an attorney-at-law for collection, attorneys' fees hereby fixed at 10 per cent (10%) \* \* \* and secured by the pledge hereof shall be due thereon." Without question, the three notes were placed in Mr. McCollister's hands for collection. Under the circumstances of this case, no "necessity" for employing an attorney need be shown by the Bank. "Provisions of this type have generally been treated in the Louisiana jurisprudence as a stipulation for liquidated damages, and they have been enforced in strict accordance with the terms of the particular provisions (citations omitted)." *Lagarde Finance Co. v. Vinet, supra,* at p. 850.

The *Quad Drilling* case also cited *Snider v. Bozarth,* 180 So.2d 800 (La.App.

4th Cir. 1965), regarding the enforcement of attorneys' fee provisions in light of prior demands upon the debtor for payment, where it was stated:

" \* \* \* our Courts have refused to enforce the stipulation where the maker has not been put in default by a prior demand for payment, or where at least no showing is made that such a demand would have been impractical and useless or where it is not shown that some other justification existed for employing an attorney to enforce collection." *Id.* at p. 801.

But in the case *sub judice,* plaintiff unequivocally testified that he understood that all three notes were due and payable on September 1, 1970. The Bank through Mr. Pace had orally agreed with plaintiff on July 29, 1970, to withhold action on notes (1) and (2) until September 1, 1970, in consideration for plaintiff's execution of note (3). In no way could plaintiff have been lulled into a belief that prompt payment of all three notes was not expected by the Bank on September 1, 1970.

We hold that plaintiff had sufficient notice that the three notes were due on September 1, 1970, and that the attorneys' fee provisions were legally invoked when the Bank turned over the three notes to their general counsel for collection due to nonpayment after the close of business that day.

▮▮▮▮ We now must consider the Houston compromise, and what was contemplated by the parties to be encompassed therein. La. Revised Civil Code Article 3071 provides:

"A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.

"This contract must be reduced into writing."

Since there is no sacrosanct form required by law for a compromise to be effective. *Hornsby v. Travelers Indemnity Co.*, 128 So.2d 280 (La.App. 1st Cir. 1961), *Charbonnet v. Ochsner*, 236 So. 2d 86 (La.App. 4th Cir. 1970), aff'd 246 So.2d 844 (La.1971), we hold that the "writing" requirement of La.R.C.C. § 3701 was satisfied when Mr. McDaniel, with plaintiff's consent, announced for the record that "in settlement of the controversy herein, * * * Mr. Morrow as debtor in possession * * * would receive the sum of $200,000 out of the consideration received for the sale" of the pledged stock.

In determining the parties' intent in settling the controversy, we may consider parole evidence. *Trask v. Lewis*, 258 So.2d 603 (La.App. 1st Cir. 1972); *Moak v. American Auto. Ins. Co.*, 242 La. 160, 134 So.2d 911 (1961). Mr. McDaniel understood that the compromised figure which plaintiff was to receive would be coming from a voluntary reduction in attorneys' fees paid to Mr. McCollister's law firm. He did not question the validity of the fees. The question, if any, in Mr. McDaniel's mind was the validity of the sale of the pledged stock. But plaintiff failed to inform Mr. McDaniel about Mr. Pace's June 24, 1970, letter referring to notes (1) and (2) being due on July 1, 1970 (before Pace's oral extension to September 1, 1970), and thus any error of material fact which Mr. McDaniel may have been laboring under was attributable to plaintiff and did not bear upon the attorneys' fee issue.

We need not answer the question as to whether or not the validity of the sale of the pledged stock was compromised because plaintiff expressly waived all claims as to the validity of the sale of the stock at the commencement of the trial before this Court. Since La.R.C.C. § 3078 provides that "transactions have, between the interested parties, a force equal to the authority of things adjudged," we must also conclude that plaintiff's claim for return of the reduced attorneys' fees of $130,047.70 is barred as res judicata. Mr. McDaniel's testimony at trial and his questioning of plaintiff during the show cause hearing compel the conclusion that any question as to the validity of the attorneys' fees received by McCollister, Belcher, McCleary, and Fazio was settled by the compromise agreement. Plaintiff's receipt and retention of the $200,000.00 cashier's check is further evidence of his assent to the compromise agreement.

For these reasons, judgment will be entered herein in favor of the defendant, American Bank & Trust Company, dismissing this suit at plaintiff's cost.