INGRAM CORPORATION and Ingram Contractors, Inc., Plaintiffs-Appellees,

v.

J. RAY McDERMOTT & CO., INC., Oceanic Contractors, Inc., Charles L. Graves, Robert K. Richie and James E. Cunningham, Defendants-Appellants.

No. 82–3119.

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1983.

---

**1296**

See also 495 F.Supp. 1321.

Denis McInerney, Michael P. Tierney, New York City, Harry A. Rosenberg, New Orleans, La., for McDermott.

Patricia Ann Pickrel, New York City, for Robert Richie.

Martin Minsker, Washington, D.C., Monroe & Lemman, William J. Hamlin, New Orleans, La., for plaintiffs-appellees.

Before CLARK, Chief Judge, BROWN and POLITZ, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The antitrust defendants in this interlocutory appeal, allowed under 28 U.S.C. § 1292(b), seek to have this Court review the refusal of the District Court to grant summary judgment in their favor on the plaintiffs'[1] state[2] and federal[3] antitrust and RICO[4] claims. As a defense to the antitrust suit, the defendants assert the validity of two general releases executed by the plaintiffs in favor of defendants. The antitrust plaintiffs counter with the defense that these releases are vitiated due to defendants' fraudulent concealment of an antitrust conspiracy. The District Court refused to give effect to the releases based on the plaintiffs fraudulent concealment defense and thereby declined to dispose of the case through the summary judgment method. We conclude, as a matter of law, that the District Court erred in its failure to give effect to the general releases as a proper defense to the plaintiffs' claims. We therefore reverse.

Plaintiffs-appellees, Ingram Corporation and Ingram Contractors, Inc. ("Ingram") brought this suit against defendants-appellants,[5] McDermott, Inc. (formerly J. Ray McDermott & Co., Inc.), its subsidiary McDermott International, Inc. (formerly Oceanic Contractors, Inc.), and certain other

1. The antitrust plaintiffs instituted this action pursuant to 15 U.S.C. § 15 of the Clayton Act seeking treble damages for the defendants' antitrust violations and under 18 U.S.C. § 1962 of the Racketeer Influenced and Corrupt Organizations Act to recover treble damages suffered by them as a result of the defendants' racketeering activities.

2. La.Rev.Stat.Ann. § 51:121, *et seq.* (West 1965 & 1982 Supp.) (state antitrust laws); La.Civ. Code Ann. arts. 1824 *et seq.* (West 1952) (contract invalid by reason of error in the motive), 1847 *et seq.* (West 1952) (contract invalid by reason of fraud), and 1950 *et seq.* (West 1977) (common intent of the parties prevails over literal words in the contract).

3. 15 U.S.C. §§ 1 and 2 (The Sherman Act) Section 1 provides in pertinent part—
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal
Section 2 provides—
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

4. 18 U.S.C. § 1962 (the Rico statute) Section 1962 provides in pertinent part—

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

\* \* \* \* \* \*

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

5. The issue controverted in this interlocutory appeal does not involve all of the parties to the main antitrust suit. Specifically not a part of this appeal, but parties to the central suit, are Halliburton Company and its wholly owned subsidiary, Brown & Root, Inc., and Hugh Westcott Gordon, Jr., executive vice-president of Brown & Root, Inc. Additional parties, some known, others not, are named as co-conspirators in this action. It is neither relevant nor necessary to list their names here.

named McDermott corporation executives and directors.[6] Ingram alleges a number of antitrust and RICO violations and contract impairments in its four Count, 64 paragraph original complaint and three Count, 28 paragraph amended complaint. In addition to citing numerous violations of federal laws,[7] and Louisiana antitrust statutes,[8] Ingram asserts that the general releases involved in this dispute are ineffectual because of McDermott's fraudulent concealment of an antitrust conspiracy. Because of our disposition of this case and the narrow issue considered, we have not been concerned with the substance of the dispute. Thus, our recasting of the facts concerns only the validity of the releases, not the underlying merits of Ingram's antitrust suit.

## I.

### *Facts*

### A. *Basic Ingredients for an Antitrust Suit*

Ingram's initial foray into the marine construction business was in 1964. It began rather modestly with only two small barges as equipment, which had been purchased from a small marsh dredging company then in receivership. But by 1970, according to its own claims, Ingram had become the third largest marine construction and contracting firm in the world. Thus, although starting modestly, within a few years Ingram came to be of similar ilk as its worldwide competitors—McDermott and Brown & Root. Just one year prior to achieving this exalted status in the marine construction world, Ingram asserts that McDermott and Brown & Root undertook to curtail, if not eliminate, its participation in the industry. Ingram claims that these defendants engaged in a bid-rigging conspiracy designed to make it a major statistic on the ledger of bankrupt marine construction businesses in 1970. They are alleged to have done this by submitting fixed and inflated bids in parts of the world where Ingram did not have equipment and personnel located to enable them to compete. Conversely, they are alleged to have submitted artificially low bids in those parts of the world where Ingram found it lucrative to compete. In a phrase, this allegation amounts to conspiratorial collusive bidding between the defendants.

Such collusive bidding practices forced Ingram into a business dilemma: (i) if it submitted bids higher than its competitors, it would surely not be awarded the work contract; (ii) if it chose to submit bids it would have to do so at ruinously low rates in order to be awarded the marine construction contract; (iii) if it chose not to submit bids, it could no longer be considered a functional competitor in the marine construction industry. Ingram chose the middle road.

Furthermore, Ingram complains that there was no part of the marine construction industry that these defendants did not seek to control and monopolize. The conspiracy between the defendants covered both domestic and foreign marine construction work. The defendants divided between themselves, on an equal dollar volume basis, projects that had the potential to be collusively bid. The defendants kept track of this information by keeping "score cards." These "score cards" recorded past bid-rigging projects and their dollar volume.

Ingram contends, moreover, that the antitrust conspiracy involved activities besides bid-rigging. The conspiracy touched on day rates charged for short term work. It in-

---

**6.** The McDermott companies and the individual defendants will be collectively referred to as "McDermott." At relevant times the individual defendants have served as officers or directors of the McDermott companies. For instance, Charles Leonidas Graves has served variously as president, director, chairman of the board, and chief executive officer of McDermott. Robert Kenneth Richie has served as president of Oceanic and has been a McDermott director. James E. Cunningham has served McDermott variously as its executive vice-president, chief financial officer and chief administrator, and a director.

**7.** *See* nn. 3 and 4.

**8.** § 51:121 *et seq.,* n. 2.

volved agreements between the defendants not to compete with each other in certain geographic areas of the world, and agreements not to compete for work let them by certain "reserved" customers. In addition, the conspiracy included efforts by the defendants at sundry times to agree to and enforce standard terms in the contracts which they offered to their customers. Essentially, Ingram alleges that there was no part of the marine construction business which was unaffected by the conspiracy.

The result, Ingram alleges, was that this forced them into a position of having to sell their assets or face sure insolvency by late 1971. Because of its poor financial predicament, Ingram decided to retreat from the industry by selling all of its assets in the marine construction industry. On November 19, 1971 Ingram entered into a series of contracts with McDermott who paid approximately $42 million to acquire Ingram's assets and take over Ingram's then existing contractual obligations to its customers.

### B. *Add a Release for Flavor*

Within a short time after this deal was closed, numerous contract disputes arose between the two parties concerning the completion of Ingram's unfinished construction work at the time of the sale as well as other matters relating to Ingram's withdrawal from the marine construction business. These disputes, which surfaced at least as early as February of 1972, involved claims by McDermott that there were substantial breaches of the warranties of title made with respect to certain of the assets transferred (principally relating to a half inter-

est in a derrick barge which had been jointly owned by Ingram and an Italian company), and a claim of Ingram that the purchase price stated in the Purchase Agreement had not been computed properly and should therefore be increased by approximately half a million dollars. Other disputes quickly developed. Among other things, Ingram refused to make payments called for by the Subcontract Agreement, asserting that certain costs charged by McDermott were not job costs under the Subcontract Agreement or were excessive because of inefficiencies in McDermott's performance of the work. Claims in excess of $11 million were asserted by McDermott against Ingram, which in turn asserted some $1 million in claims against McDermott.

The disputes were complex, involving a wide variety of legal and factual issues, and there were numerous meetings and extensive correspondence between the parties in an effort to define and resolve the disputes. Settlement negotiations proceeded for over a year and a half.[9] It is significant to mention that at all times during these rather protracted negotiations the interests of both Ingram and McDermott were being closely guarded by a cadre of lawyers from throughout the country, including major urban areas like Nashville, New Orleans, and New York.

Finally, on May 2, 1973, a settlement agreement was reached in which Ingram offered to pay McDermott a sum in excess of $1.2 million with an exchange of releases.[10] McDermott accepted. The settlement

---

**9.** A breakthrough in the negotiations occurred on March 26, 1973, when F.B. Ingram, Chairman of the Board of Ingram, wrote McDermott concerning the matters in dispute between the parties. The letter was intended to "set forth in writing, on a without prejudice basis, [Ingram's] position on various points so that there will be no question in [McDermott's] mind as to where [Ingram] stand[s]." The letter was a general discussion of points of dispute between the parties concerning various property, job costs, and all other "matters arising out of the November 1971 transactions." The letter was considered by Ingram to be a "compromise settlement of [the parties'] outstanding differences." In a letter dated April 23, 1973, R.K.

Richie, a McDermott officer, accepted in its behalf the offer made by Ingram as "full settlement of all claims between the parties. . . ."

Included in Richie's acceptance of Ingram's offer of settlement was an instruction that McDermott's "attorneys will be contacting [Ingram's] attorneys today in order to arrange the documentation of the settlement." The settlement agreement and the releases are the product of the meeting between the lawyers.

**10.** The Settlement Agreement was between Ingram and Oceanic Contractors, now McDermott International, a subsidiary of McDermott, Inc. The agreement was on behalf and for the benefit of all subsidiaries of McDermott. Rele-

agreement was executed to "settle all claims" between the parties "in connection with the Purchase Agreement and the Subcontract Agreement" (i.e., the sale of all of vant portions of the settlement agreement follow:

### SETTLEMENT AGREEMENT

This Agreement, made and entered into as of this 2nd day of May, 1973 by and between Oceanic Contractors, Inc., a Panamanian corporation ("Oceanic") and Ingram Corporation, a Delaware corporation ("Ingram");

### WITNESSETH:

WHEREAS, Ingram and Oceanic entered into a Purchase Agreement dated November 16, 1971 (the "Purchase Agreement") pursuant to which Ingram and certain of its wholly-owned subsidiaries (herein and in the Purchase Agreement referred to as the "Ingram Subsidiaries") sold to Oceanic certain vessels and other property; and

WHEREAS, Ingram and Oceanic entered into a Subcontract Agreement dated November 16, 1971 (the "Subcontract Agreement") pursuant to which Ingram and certain of its wholly-owned subsidiaries (Ingram and such subsidiaries being herein and in the Subcontract Agreement sometimes referred to as the "Ingram Companies") subcontracted to Oceanic the performance of certain work for the customers referred to in the Subcontract Agreement; and

WHEREAS, Oceanic and Ingram and Ingram Contractors Inc. ("Ingram Contractors") entered into an Agreement regarding Ingram Derrick Barge No. 6 dated November 16, 1971 ("the DB6 Agreement") pursuant to which Oceanic in effect had a right of first refusal on any sale of said vessel by Ingram Contractors; and

WHEREAS, Oceanic and Ingram have asserted certain claims against each other under or in connection with the Purchase Agreement and the Subcontract Agreement; and

WHEREAS, the parties have agreed to settle all such claims between them as hereinafter provided,

NOW, THEREFORE, the parties hereto have agreed as follows:

1. Simultaneously with the execution hereof and in consideration of the delivery by Oceanic of the release referred to in Section 2 hereof, Ingram has delivered to Oceanic:

(a) A certified or bank cashier's check payable to the order of Oceanic in the amount of $1,284,651;

(b) A bill of sale and other documents of transfer (the "Bill of Sale") in form satisfactory to Oceanic executed by Ingram Contractors conveying title to the vessel known as Ingram Derrick Barge No. 6 to Oceanic or its designee;

\* \* \* \* \* \*

(d) A release duly executed by Ingram (the "Ingram Release") both on its own behalf and on behalf of its former subsidiaries, P.T. Ingram Contractors Indonesia (now liquidated), Ingram Far East Pte. Limited (now in liquidation) and Ingram Contractors S.A. (now in liquidation), and releases duly executed by Ingram Contractors and the following Ingram affiliates (the "Other Ingram Releases"):

Ingram Marine Inc.
Ingram Contractors Australia Pty. Limited
Ingram Contractors Indonesia Inc.
Ingram International S.A.

releasing Oceanic and its affiliated companies and their officers, directors and stockholders from all claims except for the claims expressly reserved in such releases;

(e) Copies of resolutions of the Board of Directors of Ingram, certified by the Secretary of Ingram, authorizing (i) the execution and delivery by Ingram of this Agreement, the Ingram Release and the Assignment, (ii) the performance by Ingram of all of its obligations under this Agreement, the Ingram Release and the Assignment, including, without limiting the generality of the foregoing, the payment called for in paragraph (a) of this Section 1 and the delivery of the Other Ingram Releases.

\* \* \* \* \* \*

2. Simultaneously with the execution hereof and in consideration of the deliveries made to it by Ingram and its affiliates pursuant to Section 1 hereof, Oceanic has delivered to Ingram (a) a release of all claims by Oceanic (the "Oceanic Release") against Ingram and its affiliates and their officers, directors and stockholders except for those claims expressly reserved in such releases, (b) an ASSIGNMENT dated February 22, 1973 between Amoco Trinidad Oil Company, Ingram Contractors and Oceanic (the "Amoco Assignment"), in the exact form as Exhibit A attached hereto, executed, attested to, and sealed by duly authorized officers of Oceanic, and (c) certified copies of resolutions of the Board of Directors of Oceanic approving the execution of this Agreement, the Oceanic Releases, and the Amoco Assignment.

\* \* \* \* \* \*

10. All representations and warranties made in this Agreement by either party hereto shall survive the payment and deliveries referred to in Sections 1 and 2 hereof.

\* \* \* \* \* \*

12. This Agreement shall inure to and be binding upon the successors and assigns of the parties hereto.

IN WITNESS WHEREOF, Oceanic and Ingram have each caused this Agreement to be executed by their respective officers thereunto duly authorized on the day and year first above written.

INGRAM CORPORATION
OCEANIC CONTRACTORS, INC.

Ingram's assets). It provided that the releases executed between Ingram and McDermott encompassed releasing McDermott "from all claims except for the claims expressly reserved in the releases." On July 20, 1973, the parties executed and exchanged elaborate releases jointly drafted by their attorneys.[11] Two separate releases were drafted for the two Ingram Companies; however, we have reproduced only one in the margin because the provisions are identical in both releases.

### C. *Something Went Wrong*

Five years later McDermott was indicted by a federal grand jury for antitrust violations and other illegal activities. Upon *nolo* pleas, McDermott and Brown & Root were convicted. In July 1979, exactly six years after the releases were exchanged, Ingram initiated suit against McDermott. McDermott immediately (i) moved to dismiss the suit on the four year statute of limitations ground and (ii) moved for summary judg-

ment on the basis of the releases. Ingram contended that the releases were vitiated due to fraud, which in turn, tolled the statute of limitations and would disallow dismissal of its suit. Various pretrial machinations ensued. Motions were made. Hearings were held. All of this resulted in the issuance of four opinions by Judge Morey L. Sear. We discuss the substance of the opinions chronologically.

### *First Decision (January 10, 1980)*

As stated previously, after the filing of the suit by Ingram, McDermott moved for dismissal on grounds that the statute of limitations had run and for summary judgment on the basis that the releases executed and exchanged with Ingram extinguished any claims which Ingram had against it. Ingram had anticipated these defenses. In its complaint it asserted fraudulent concealment.[12] The defendants

---

11. RELEASE
TO ALL TO WHOM THESE PRESENTS
SHALL COME OR MAY CONCERN
GREETING: KNOW YE, that
INGRAM CONTRACTORS INC.
a Louisiana corporation (hereinafter "Releasor"), for and in consideration of the sum of Ten Dollars ($10), to it in hand paid by Oceanic Contractors, Inc., a Panamanian corporation ("Oceanic"), the receipt of which is hereby acknowledged, and other good and valuable consideration, the receipt of which is also hereby acknowledged, *has remised, released and forever discharged,* and by these presents does, for itself and for its successors and assigns, remise, release and forever discharge Oceanic, its parent company, J. Ray McDermott & Co., Inc., and all other corporations substantially all of whose capital stock is owned directly or indirectly by Oceanic and J. Ray McDermott & Co., Inc., or either of them, and each and every one of their past and present officers, directors and stockholders and each of them, and their respective heirs, executors, administrators, successors and assigns, of and *from all manner of actions, causes of actions, suits,* debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, *controversies,* agreements, promises, variances, trespasses, damages, judgments, executions, *claims and demands whatsoever in law,* in admiralty, or in equity, which against them or any of them, Releasor or its successors or assigns hereafter can, shall or may have, in its own right or in a representative capacity, for, upon or by reason of any matter, cause or thing

whatsoever *from the beginning of the world to the day of these presents,* including without limitation of the generality hereof, *any past, present or future claims, matters, causes or things that Releasor has or may hereafter have arising out of, based upon or in any way relating to* the Purchase Agreement, the Subcontract Agreement, and the Agreement regarding INGRAM DERRICK BARGE NO. 6, all dated November 16, 1971, by and between Ingram Corporation, a Delaware corporation, and Oceanic (and, in the case of the Agreement regarding INGRAM DERRICK BARGE NO. 6, Ingram Contractors Inc.) and the transactions contemplated thereby, EXCEPTING ONLY any rights of Releasor under or arising by virtue of (i) the Settlement Agreement of even date between Oceanic and Ingram Corporation and (ii) Section 13(F) of said Purchase Agreement.
 IN WITNESS WHEREOF, Releasor has caused these presents to be executed, and its seal to be affixed, by its duly authorized officers this 20th day of July, 1973. (Emphasis Supplied)
 INGRAM CONTRACTORS INC.

12. Paragraph 44 of Ingram's complaint contains all of the allegations concerning fraudulent concealment. It alleges that:
 "At the time of negotiations leading to the sale agreement, as well as prior and subsequent thereto, the defendants, acting in accordance with and in furtherance of the conspiracy alleged herein, fraudulently concealed from plaintiffs the existence of the causes of action stated in this Complaint,

maintained that none of the allegations of fraudulent concealment was adequate under the provisions of F.R.Civ.P. 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity...." The District Judge disagreed. He recognized that the allegations in paragraph 44(a), concerning clandestine meetings in hotel rooms "amount[ed] to very little, for there [was] no obligation on the part of antitrust conspirators to advertise their conduct" and that "[o]ne cannot expect bid-riggers to hold a public meeting for that purpose." The other subparagraphs under paragraph 44, however, presented enough information "so that the nature of the alleged wrongful concealment [was] exposed."

Citing a Sixth Circuit case, *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (1975), the trial Judge set forth the factual showings necessary to sustain a claim of fraudulent concealment: (i) the defendants' wrongful concealment of their actions (ii) the plaintiffs' failure to discover the operative facts of the conspiracy within the limitations period and (iii) the plaintiffs' due diligence to discover those facts. In a discussion of these criteria, he observed that a plaintiff cannot prevail on a wrongful concealment claim merely by showing "ignorance of the cause of action." Rather, the defendants must commit some "affirmative deceptive act" which would "prevent discovery of the wrongful conduct."

He then ruled that the allegations in the pleadings were sufficient to overcome a motion for dismissal on the statute of limitations basis. He was of the view that Ingram had adequately alleged fraudulent concealment on the part of McDermott and that its diligence to discover such fraud was subject to factual development. The motion to dismiss was denied on the statute of limitations ground.

As to the release agreements, the Judge first determined that federal, rather than state, law applied in interpreting them. He then dismissed as "meritless" Ingram's claims that (i) despite the broad scope of the releases, it never intended to release antitrust claims, and (ii) it had entered into the release agreement because of duress or coercion. He observed that the law of the Fifth Circuit rendered it inconsequential that Ingram did not intend to release its antitrust claims and that "[t]he release which the parties signed is nearly as broad as the human mind can describe." Next, in dismissing Ingram's second contention he stated that "it is difficult to understand how a 1973 release intended to settle various monetary claims arising out of the im-

through acts and omissions including but not limited to the following:

(a) Conducting clandestine meetings in hotel rooms and other places, arranged outside the usual business channels, to discuss rigging of bids and suppression of competition;

(b) Submitting prearranged losing bids by the company that had agreed not to receive the award, in order to give the illusion of competition among the corporate defendants;

(c) Maintaining agreed-upon ratios of major equipment spreads, and positioning equipment in particular localities throughout the world, so as to give the false impression that excessive bids on particular projects were the result of equipment availability rather than of the unlawful conspiracy;

(d) Falsifying, destroying and concealing from accountants, auditors, independent directors and attorneys, records of the corporate defendants that would have revealed the existence of the unlawful conspiracies;

(e) Making payments of cash and other things of value to employees of customers, and to employees and former employees of the defendants, in order to prevent such employees from revealing to others their knowledge of the unlawful activities of the defendants in this Complaint;

(f) Causing to be filed with the Securities and Exchange Commission and to be distributed to shareholders and the public generally, statements regarding the operations and financial condition of defendants McDermott and Halliburton, and regarding the fitness of the directors thereof, including defendants Graves, Richie, Cunningham, and Gordon, to be elected to the Board of Directors, which statements failed to disclose, despite a duty to do so, the existence of the criminal conspiracies alleged in this Complaint, the participation of the individual defendants and others therein, and the liability of McDermott-Oceanic and Brown & Root for treble damages suffered by competitors and customers injured by the conspiracies.

plementation of the 1971 agreements is therefore void by reason of duress." Thirdly, and very significantly, he found that the releases were not "part and parcel" of the antitrust conspiracy and that *Ingram had not alleged a single thing in its complaint which would indicate the release "in any way furthered the goals of the conspiracy."* (Emphasis supplied).

Finally, the Judge found merit in Ingram's fourth contention—that McDermott failed to disclose to Ingram the possibility that an antitrust conspiracy existed, concealment of which would void the releases. Ingram would have to support factually its claim of wrongful concealment. At this stage of the proceedings, Ingram had not done so. Consequently, the District Court decided that McDermott's motion for summary judgment dismissal on the basis that the releases bar the antitrust suit would be continued for thirty days in order to give Ingram time to submit evidence to support its fraudulent concealment theory.[13] He further denied McDermott's motion on the state law claims by finding that a material issue of genuine fact existed between the parties with respect to their intentions when they executed the releases.

13. After a status conference was held in August of 1979, the District Judge determined that a full stay of discovery was appropriate at the early stages of the dispute. Ingram vigorously opposed this decision, but its supplications did not alter the District Judge's position. Although he cited no reasons in his order staying discovery in the cause, it should be pointed out that the parties were in the motions stage of the litigation with final briefs due approximately one year later. A decision to prevent unnecessary discovery because the case could well be decided on the parties' motions is not, on its face, fundamentally unfair to a party desiring discovery. Moreover, given the nature of Ingram's claims against McDermott and its anticipated defenses to these claims (i.e., limitations and release), staying discovery at that juncture, does not seem to us to have been improvident. *See Scroggins v. Air Cargo, Inc.,* 534 F.2d 1124, 1133 (5th Cir.1976).

14. Pursuant to the District Court's order of January 10, 1980, Ingram presented four additional affidavits. These were the affidavits of G. Glen Martin, Vice President of Ingram Contractors, Inc. at the time of Ingram's sale of its assets to McDermott; Emory Ornelles, Senior

*Second Decision (March 19, 1980)*

The District Court next considered that part of McDermott's motion it had continued for thirty days by previous court Order. The time for Ingram to present evidence on its fraudulent concealment claim had come. By way of affidavits,[14] Ingram submitted evidence it thought would demonstrate McDermott's fraudulent concealment. In these affidavits Ingram's representatives made four contentions about McDermott's behavior to nullify the validity of the releases. First, one of the affiants asserted that McDermott's statements about its "stacked costs" [15] was an overly bleak exaggeration of its financial position. The District Court recognized that this contention was an attempt by Ingram "to bootstrap McDermott's negotiating position on stacked costs into a legally cognizable failure to disclose." The court rejected this argument by pointing out that "arms-length parties are under no obligation to make full disclosure to each other." In the court's view, the "stacked costs" contention *did not make "the failure to disclose possible antitrust violations particularly significant."* (Emphasis supplied).

Second, one of the affiants stated that during the settlement negotiations McDer-

Vice President of Ingram Corporation and a participant in the meetings and negotiations leading up to the sale of Ingram's assets; Thomas B. Lemann, legal counsel to Ingram Corporation; and a supplemental affidavit of Frederic B. Ingram, Chairman of the Board of Ingram Corporation.

15. "Stacked costs" in this context means the costs incurred by McDermott because the equipment it purchased from Ingram in 1970 remained idle. The position of McDermott was that Ingram should "absorb one half of the 'drag' on [McDermott's] finances due to additional overhead, depreciation, and interest, as well as the total out-of-pocket expenses associated with maintaining the equipment when idle...." Affidavit of G. Glen Martin, ¶ 11. Affidavit of Emory M. Ornelles, ¶¶ 5–6. Ingram, on the other hand, protested. Martin affidavit, ¶ 12. The gravamen of Ingram's allegation on this point is that McDermott's statements led Ingram to believe that competitive market conditions existed and its position was developed accordingly.

mott submitted a report to Ingram purportedly including all possible claims between the parties. Ingram asserted that mention of antitrust claims in this status report was conspicuously absent.[16] The trial Judge gave this contention short shrift, noting that the status report, on its face, listed only claims "to-date". He concluded that the report did "not misrepresent anything and thus can have no effect on the validity of the releases."

Next, Ingram's Board Chairman contended that McDermott's president, Roger Wilson, had told him that the reason Ingram was financially crippled was due to its size. The District Court found that this statement was made *before* the sale of Ingram's assets in 1971 and a full two years *before* the releases were executed. Consequently, Ingram could claim no reliance on that statement in entering the releases.

Fourth, Ingram contended that its false impression of competition in the marine construction industry was derived from bidding patterns and equipment locations which it had considered legitimate. Its impression of competition in the industry thus caused it to leave the business (sell the assets) and later execute the releases with McDermott. This would render the releases void because induced by fraud. The trial Judge rejected this argument by observing that Ingram's contentions may bear on the issue of McDermott's fraudulent concealment of the antitrust conspiracy, but "they [were] irrelevant to the validity of the releases", which had been entered into a full twenty months after Ingram had left the industry—the alleged object of the conspiracy. The trial Judge summed up this position by stating that "generalized perceptions and beliefs do not form a sufficient basis for a charge of fraud in the making of a contract, which is the issue here."

Finally, the trial Judge observed that Ingram's submissions via F.R.Civ.P. 56(f)

were inadequate to defeat either McDermott's summary judgment motion or its motion for dismissal.[17] He aptly observed that F.R.Civ.P. 9(b) requires fraud to be alleged with particularity. In order for the Rule 56(f) affidavit to yield any fruit for Ingram, it must contain specific factual statements of fraud. The substance of the Rule 56(f) affidavits was based on the government's indictments of McDermott which alleged fraudulent concealment of the conspiracy between the defendants, but did not contain a single reference to fraudulent misrepresentation by McDermott in 1973 which would vitiate the releases. The indictments themselves did not contain a single reference to any misrepresentation on McDermott's part in getting Ingram to sign the releases. Ingram's argument on this score was a derivative of its previous "part and parcel" of the antitrust conspiracy contention, and, in the words of the District Court, "it can be no more successful here than it was before." Thus, Ingram's general conclusions in its Rule 56(f) affidavits did not constitute sufficient proof to defeat a summary judgment motion.

Based upon all of Ingram's submissions by affidavit, Judge Sear granted McDermott's motion for summary judgment on the federal causes of action. As a way of explaining this result, the Judge emphasized that "Ingram entered into *an extraordinarily broad general release in 1973 after prolonged negotiations involving experienced corporate officials and competent counsel.* It may not now escape the effects of that release with generalized and unsupported claims of fraud." (Emphasis supplied).

The significant part of this decision was the distinction drawn by the District Judge between fraudulent concealment of the antitrust conspiracy for statute of limitations purposes, on the one hand, and on the other, fraud which would render the releases un-

---

**16.** Ornelles affidavit, ¶ 8.

**17.** Two of the lawyers in Ingram's arsenal of counsel submitted affidavits to urge the Dis-

trict Court to allow discovery to proceed so that Ingram could prove fraud on the part of McDermott which would void the releases.

enforceable. The Judge concluded that *only fraud during the course of negotiations between the parties would constitute the requisite fraud to vitiate the releases.* In other words, McDermott would have had to have made some material misrepresentation upon which Ingram relied to enter into the release agreements. Mere fraudulent concealment of an antitrust conspiracy, unrelated to the negotiations which brought about the execution of the releases, did not, by itself, establish fraud to render such broad releases ineffectual.[18]

*The Third Decision (August 14, 1980)*[19]

A. *Ingram's Motion for Reconsideration*

Ingram moved for reconsideration of the District Court's second Order. It urged that Judge Sear's distinction between fraudulent concealment of the antitrust conspiracy and fraud sufficient to vitiate the releases "ill-founded." 495 F.Supp. at 1328. Presenting a policy argument, Ingram argued that it would be reckless abandon for the court to provide an incentive for antitrust violators to suppress evidence of their conspiracy and later obtain releases from unsuspecting victims. Such a posture, Ingram argued, advanced neither the law of general releases nor federal private antitrust enforcement. In sum, the distinction the Judge had drawn was inequitable, unfair, and disserved antitrust purposes.

McDermott contended, however, that the federal courts do and will enforce a release against antitrust claims. It argued that the law in no way required a releasee to divulge all claims that the releasor may have had against the releasee, especially when no fiduciary duty existed between the parties.

It further contended that if the law required a releasee to divulge all claims—both known and unknown—that a releasor may have against it, then there would be little place in our jurisprudence for a general release. McDermott, very much like Ingram, responded with its own policy argument that such a position would greatly undermine the public policy of encouraging compromise and settlement of differences between parties.

The Judge then proceeded to try to reconcile these two seemingly divergent views. He emphasized that courts have not allowed antitrust claims to escape the reach of a release which the corporate "parties have confected following arms-length bargaining"; moreover, a party to a release was not required to disclose all claims another party might reasonably have against it unless there existed a fiduciary relationship between them. He pointed out that a releasor "takes a calculated risk" and cannot expect that the releasee will alert him to the adverse consequences of the releasor's decision to release both known and unknown claims. Significantly, the Judge observed that "were the law otherwise it would be virtually impossible for the courts ever to enforce a general release, a result which would greatly undermine the public policy which encourages compromise of differences." *Id.*

Nevertheless, the Judge opined that the primacy of private enforcement of the antitrust statutes led him to the definite conclusion that "peaceful settlement of differences is little, if any, advanced by rewarding those antitrust violators who are able to cloak their unlawful activities." *Id.* 1329. He held that a party to a release "cannot

---

**18.** Subsequent to this order of the District Court, Ingram amended its Complaint to allege three additional pendent state claims. Counts 5 (conspiracy to restrain trade, La.Rev.Stat. Ann. § 51:122) and 6 (conspiracy to monopolize, La.Rev.Stat.Ann. § 51:123) are the Louisiana analogs to Counts 1 and 2 (Sherman Act violations). Count 7 alleges that the two re-

leases are rendered invalid by reason of error and fraud under La.Civ.Code Ann. arts. 1821 *et seq.* and that La.Civ.Code Ann. art. 3073 permits parol evidence to be admitted in order to determine the intent of the parties to a release agreement.

**19.** 495 F.Supp. 1321 (E.D.La.1980).

affirmatively act to deprive those with whom [it] negotiate[s] of material information they would otherwise receive." *Id.* at 1330. Thus fraudulent concealment of an antitrust conspiracy from a party with whom a conspirator has negotiated a release was fraud sufficient to void any such release.

The District Judge decided that the issue was really not one of whether or not the releases were valid. Rather, the issue was whether or not the *public interest* was served by enforcing a release against an antitrust plaintiff who had no knowledge of an antitrust conspiracy before he entered into a release agreement with an antitrust conspirator. Framing the issue in this way, the District Judge concluded that his March 19, 1980 decision granting McDermott's motion for summary judgment was in error. He then reversed himself by vacating that Order.

### B. *McDermott's Motion for Reconsideration*

At the same hearing, McDermott moved for reconsideration of that portion of the District Court's first order of January 10, 1980 which denied its motion for summary judgment as to Count 4 (the state law claims) of Ingram's Complaint which alleged that the antitrust conspiracy rendered Ingram's 1971 sale of assets to McDermott "voidable and invalid by reason of error or motive, fraud, and threats inspiring fear of great injury to fortune. . . ." The District Judge had held in his first Order that state law allowed the introduction of parol evidence to determine the intent of the parties at the time they entered into the releases. The court had found that a material issue of genuine fact existed as to the intentions of the parties when negotiating the releases. The affidavits of Thomas O. Lind, Secretary and Counsel for Ingram Corporation, and Frederic B. Ingram had placed the parties' intentions in issue. Lind declared that neither the settlement agreement nor the

releases was drafted to cover antitrust claims or any other claims not arising from the Purchase Agreement reached in 1971.[20] Frederic Ingram insisted that the releases and settlement agreement only related to disputes about the sale of equipment and subcontract work.[21]

McDermott protested. It argued that the statements in these affidavits were essentially after-the-fact, litigation-oriented declarations. McDermott contended, in the words of the lower court, that *"Ingram has discovered that some of the causes of action it released are potentially lucrative and that it is therefore trying to escape from a broad compromise agreement which it entered into quite freely." Id.* at 1331. (Emphasis supplied).

Deciding, however, that McDermott had misread "the import of these affidavits" in view of the familiar rule that "on a motion for summary judgment, the inferences drawn from underlying facts must be viewed in the light most favorable to the opponent of the motion," the court denied summary judgment on the state law claims. While recognizing that (i) the language in Lind's affidavit was "somewhat ambiguous," (ii) Frederic Ingram's affidavit used "even more general language," (iii) both affidavits "could have been more artfully drafted," and (iv) as evidence, the affidavits were "not particularly persuasive," Judge Sear rebuffed McDermott on the ground that its argument foundered "on an incorrect reading of the affidavits."

Not to be dissuaded from pursuing its position that the state law claims were barred, McDermott postulated that the circumstances of this case bar allowance of parol evidence bearing on the intent of the parties for three reasons:

(1) parol evidence should not be admitted in a case where experienced corporate officials represented by competent and knowledgeable counsel negotiated a settlement

---

**20.** Affidavit of Thomas O. Lind, ¶ 4.

**21.** Affidavit of Frederic B. Ingram, ¶ 10.

and entered into a release in a complex multi-million dollar dispute,

(2) the language of the releases is "unambiguous" on its face and any contention by Ingram that it failed to comprehend the implications of the releases is "plainly frivolous," and

(3) that McDermott did not at any time make oral representations to constrict the scope of the releases, hence there is nothing which parol evidence could show. Believing himself to be bound by Louisiana law with regard to each of McDermott's contentions, the trial Judge refused to grant summary judgment on the state law claims.

In a subsequent minute entry following his third Order, Judge Sear also partially lifted his stay of discovery,[22] previously entered August 21, 1979, before any of the opinions herein discussed had been rendered, to enable the parties to interrogate certain past and present Ingram officers concerning their knowledge of an antitrust conspiracy between McDermott and Brown

& Root. Two months later the parties were back in court seeking a clarification of the court's partial discovery order. Ingram wanted to extend discovery to the substance of the conspiracy. McDermott wanted it limited to the Ingram officers' knowledge of the conspiracy. Resisting Ingram's attempt to go on a "fishing expedition", *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the District Court restricted the scope of discovery to discern facts regarding Ingram's knowledge of the conspiracy. Discovery took place between the District Court's third and fourth Orders.

### *Fourth Decision (July 8, 1981)*

Partial discovery resulted in factual disputes. McDermott moved for summary judgment on the basis that depositions established that Ingram's officers were aware that (i) bid-rigging occurred between McDermott and Brown & Root; (ii) Ingram itself had engaged or tried to engage in certain anticompetitive practices;[23] and

**22.** *See* n. 13, *supra.* The subsequent history of this case demonstrates how unbridled discovery at the preliminary stages of the proceeding would have materially altered the rights and claims of the parties. Even after one year had passed, partial discovery was all the District Judge was willing to allow because to him there existed a possibility that a legal question could still settle the dispute without going any further. See *Manual for Complex Litigation* 95 (1981). When Ingram alleged fraudulent concealment of the antitrust conspiracy, McDermott put forth two affirmative defenses: limitations and release. Ordinarily, the issues of whether a plaintiff has sufficiently alleged the basis of his claim and the sufficiency of an opposing party's defenses are, in the first instance, committed to the sound discretion of the trial court. It is easy to see how discovery would have disturbed the balance that existed between the parties at that stage. More knowledge wrought by more discovery of the factual basis of its lawsuit would have been a mighty leveler for Ingram, and would have, for obvious reasons, forced McDermott to a trial on the merits and thus deprived it of the possible benefit of its bargain. Presented with a virtual concordance of evidence surrounding the underlying antitrust action, a reasonable trial Judge would be much less inclined to consider dismissal and summary judgment motions, understandably preferring the safer route of dismissal, if at all, at least until the closing of the plaintiff's case. This disposition at that point would simply have confused the issues,

which were, by reason of McDermott's facially legitimate defenses, whether fraudulent concealment was adequately alleged, thus precluding a limitations defense, and, if so, did the releases bar the suit anyway. As noted earlier, those were peculiarly *legal* questions.

Full blown discovery would thus have had two possible effects: (i) forcing McDermott to a trial on the merits, or (ii) accumulation by Ingram of a vast amount of information mainly pertinent to a trial on the merits, but would have meant, in the event of early resolution of the suit on legal grounds, wasted time, resources, and efforts of all parties and the District Court. The draftsmen of the federal procedural rules did not contemplate such anomalous results. Compare this case with *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (District Court upheld in granting summary judgment in favor of a defendant who, after 11 years, had not filed a formal answer to plaintiff's complaint, and plaintiff had not engaged in any discovery against key defendants, but had himself been interrogated by the defendants for a total of 153 days over a five and one-half years' period).

**23.** Ingram contested the contention that it tried to become a part of the conspiracy. It also argued that the deposition testimony of Benton was suspect because he had a reputation for untruthfulness and had engaged in unlawful practices previously. Howson's testimony was

(iii) Ingram had failed to exercise due diligence to discover the existence of the antitrust conspiracy. Ingram, on the other hand, as expected, (i) hotly contested suggestion of its business impropriety, (ii) vigorously asserted its diligence to discover an antitrust conspiracy between McDermott and Brown & Root, and (iii) denied awareness of the defendants' bid-rigging practices until the conspiracy was brought to light by the Justice Department prosecution of McDermott and Brown & Root.

On the basis of the depositions taken after partial discovery was permitted, Judge Sear considered whether Ingram could sustain its heavy burden of proving fraudulent concealment. He concluded that Ingram was unable to prove the first element of the doctrine of fraudulent concealment because his stay of discovery limited Ingram's access to evidence of the defendants' alleged concealment. From depositions taken of W. Joseph Benton, former chief operating officer and board member of Ingram and Robert E. Howson, former senior vice president of Ingram, which McDermott contended showed that Ingram had actual knowledge of the antitrust conspiracy, the Judge concluded that since Ingram (i) challenged the veracity of Benton's and Howson's deposition statements and (ii) offered contrary explanations of their memory of events, this presented fact issues suitable for jury resolution. Next, he concluded that this stay of discovery on the merits had prevented information gathering on Ingram's constructive knowledge of the conspiracy. Moreover, in order to determine whether Ingram had demonstrated due diligence in uncovering the conspiracy, the trial Judge decided that more factual information was needed about the "cover-up itself, since it may be that the conspiracy was so well hidden that any of the steps . . . Ingram could have taken, but did not, such as questioning customers, consulting counsel, and complaining to the Department of Justice, would have been fruitless." He further ruled that "Ingram's attempts to rig bids do not necessarily defeat its claim of due diligence" and that the inference he must draw from Ingram's conduct "is that Ingram engaged in collusion where beneficial while keeping a lookout for collusion that was injurious."

As to the releases, he reiterated his prior ruling that the releases would be void if Ingram could establish McDermott's fraudulent concealment. He explained his ruling thusly:

> I cannot conclude that an antitrust plaintiff who suspects he has been injured by the defendant's wrongful conduct yet executes a release in favor of the defendant has failed, as a matter of law, to exercise due diligence. It is possible that he executed the release only after satisfying himself that his suspicions were groundless. At that point, ignorant of the antitrust violations that in fact have occurred, the plaintiff stands in the same shoes as the victim who never suspected wrongdoing in the first place. His exercise of due diligence has not necessarily been diminished by the decision to enter into the release, although certainly that is an inference a jury might draw.

Because he believed that these issues of material fact existed, the District Judge concluded that it would be inappropriate to render summary judgment in favor of McDermott.[24] We now consider the parties' contention on appeal.

---

similarly subject to substantial discount because (i) he was now a high-ranking McDermott officer and (ii) when he terminated employment with Ingram there was animus flowing between him and Ingram's Chairman of the Board. Given these circumstances, Ingram argued, summary judgment was precluded.

**24.** The District Court further denied McDermott's request to further certify to us an interlocutory appeal on Ingram's claims of fraudulent concealment and the effect of the releases.

It did this on the theory that such an appeal would result in further delaying the litigation of the case. McDermott filed its notice of appeal with a motion to expedite. We denied the motion to expedite appeal. We also denied McDermott's petition for a writ of mandamus to require the District Judge to certify an interlocutory appeal with suggestions to the District Judge that he might reconsider his decision in light of our changed docket which would not

## II.

### Redel's Still Prevails

Our decision in *Redel's, Inc. v. General Electric Company*, 498 F.2d 95 (5th Cir. 1974) squarely controls this case. The facts in *Redel's* are as follows. Redel's was a franchise dealer with General Electric with whom, prior to 1969, it had entered into a franchise agreement annually. The year 1969—apparently a very good year for long commitments—brought a change in the way the parties chose to do business. Instead of renewing their franchise agreement annually, as they had done for many years theretofore, the parties agreed to let the 1969 agreement remain effective "in perpetuity with yearly addenda rather than a contract requiring renewal annually," subject only to a dually recognized termination clause in the contract. Three years after this change of business dealings, Redel's instituted an antitrust action against General Electric, alleging, "inter alia, numerous claims of unlawful price discrimination occurring from 1965 through 1971, which allegedly resulted in substantial loss of sales volume and the collapse of Redel's business in 1971." *Id.* at 98.

The 1969 agreement included a general release provision which was inserted by General Electric and agreed to by Redel's. The release provided that Redel's would release General Electric Company from "all claims . . . and liabilities, if any there be, as of the date of the execution of [the] agreement . . . [ ]." *Id.* at 100 (note omitted). The highest officer in Redel's corporation had executed the release. We held that as to the retrospective application of the general release (i.e., covering claims which arose before the execution date of the release), the release was valid and effective. We pointed out that the release executed by the franchise dealer (Redel's) and General Electric, written in "unmistakably clear" language, without any ambiguity, so that the intention of the parties was unmistakened, left no room for doubt as to its effectiveness. We further observed that, though

result, as he feared, in substantial delay. Subsequently, the District Court certified an inter-

it had not been etched in stone, "antitrust policy certainly encourage[d] the parties to a general release to evidence their intention to release antitrust claims." *Id.* at 101. Thus, in effect, we concluded that a general release was sufficient to release antitrust claims.

 Controlled by this precedent, we are of the view that the releases involved in this case apply to antitrust claims. At the outset, we should recognize that throughout this litigation the parties have characterized the contracts in dispute as "general releases." In the first part of the releases the language reads expressly like general releases in that the releasor agrees to release "all claims and demands whatsoever in law" against the releasee. "General" was used in its all comprehensive sense—covering *all* claims of any character whatsoever, whether known or unknown, hence the anachronistic but still vivid words covering claims "from the beginning of the world to the date of these presents." But then at the very end of this long and expansive sentence in the releases, specific reference is made to the release and settlement of all claims "arising out of, based upon, or in any way relating to the purchase agreement, the subcontract agreement, and the [option] agreement. . . ." *See* note 11, *supra*. In essence these three settlement agreements amounted to the sale and conveyance of Ingram's assets to McDermott.

The releases thus have both general and specific characteristics, they are general in the same sense that every claim between the parties under the sun, no matter when it arose or whether it has yet arisen, is encompassed by the release. It is specific and thus definitely covers any and all claims which may have arisen or might arise from the sale of Ingram's assets. The sale of assets was Ingram's getting out of the business. Any claim pertaining to the sale of assets *must* be a claim "arising out of, based upon or in any way relating to" *Id.* Ingram leaving the business and is therefore encompassed by the releases.

locutory appeal pursuant to 28 U.S.C. § 1292(b).

Ingram's theory is that it was forced to sell its business because of the defendants' antitrust conspiracy. Since this is so, it *must* follow that any damages Ingram sustained because of the sale of its assets, which is the substance of its claim under the Clayton Act, are covered by the releases.

The releases given by Ingram, as mentioned before, specifically related to the Purchase Agreement, the Subcontract Agreement and the Agreement regarding INGRAM DERRICK BARGE 6 dated November 16, 1971, between Ingram and McDermott. These documents represented the purchase of Ingram's business. As precisely as words can, they release McDermott from any difference between true value and the price paid for Ingram's business. This is precisely the stuff, and the only stuff, of which federal antitrust damages are made. If Ingram can prove no damages, and it cannot because they have been released, then Ingram has no basis for its claim for antitrust relief. *McClure v. Undersea Industries,* 671 F.2d 1287 (11th Cir.1982); *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.,* 670 F.2d 575 (5th Cir.1982); *Jot-Em-Down Store (JEDS), Inc. v. Cotter & Co.,* 651 F.2d 245 (5th Cir.1981); *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 852 (5th Cir.1981); *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 270 (5th Cir.1979); *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 984 (5th Cir.), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 694 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), *modified,* 575 F.2d 564 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

Hence, the intention of the parties must be construed to release those claims which arose because Ingram sold its business and assets regardless of whether the sale was a free economic act or was brought about because of the antitrust conspiracy between the defendants. Doubts as to the meaning of a release which is general in terms of claims covered can be eliminated by language which describes in detail a specific controversy compromised. In this way a special or limited release becomes a general, absolute release as to all claims and specifically those growing out of the special identified controversy.

The releases in dispute provide that [Ingram] has *remised, released, and forever discharged,* and by these presents does, for itself and for its successors and assigns, remise, release and forever discharge [McDermott] and each and every one of [its] past and present officers, directors and stockholders and each of them, and their respective heirs, executors, administrators, successors and assigns, of and *from all manner of actions, causes of actions, suits,* debts, dues, sums of money, accounts, reconings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, *damages, controversies,* Judgments, executions, *claims and demands whatsoever in law,* in admiralty, or *in equity which against them* or any of them, [Ingram] or its successors or assigns hereafter *can, shall or may have,* in its own right or in a representative capacity, for, upon or by reason of any matter, *cause or thing whatsoever from the beginning of the world to the day of these presents, including without limitation of the generality hereof, any past, present or future claims, matters, causes or things that [Ingram] has or may hereafter have arising out of, based upon or in any way relating to the Purchase Agreement, the Subcontract Agreement,* and the Agreement regarding INGRAM DERRICK BARGE NO. 6, dated November 16, 1971, by and between Ingram and [McDermott] (and, in the case of the agreement regarding INGRAM DERRICK BARGE NO. 6, Ingram Contractors, Inc.) and the transactions contemplated thereby, EXCEPTING ONLY [two exceptions not relevant here]. (emphasis supplied.)

■ A court is entitled to take words spoken so clearly in their ordinary and plain sense. "Unmistakably clear" language which is contained in releases negotiated by commercial parties with substantially equal bargaining power should be construed to mean what it says. It does not matter that Ingram may not have known of or articulately considered all the possible claims it was relinquishing against McDermott. Nor is this situation altered because the record is equivocal as to whether antitrust claims were ever a primary consideration during either the negotiations to sell Ingram's marine construction business or settlement of the parties' outstanding controversies. These factors alone do not require a court, absent very exceptional circumstances, to vitiate otherwise valid releases. This is especially true when the party asserting the invalidity of the releases has made insufficient factual allegations to show that the releases were procured by accident, mutual mistake, fraud, duress, or any other tactic that overbore or distorted his will which may have caused him to act in a way other than sound business judgment would have ordinarily dictated.

■ Thus, Ingram cannot escape the validity of the releases by merely asserting ignorance of its antitrust claim. Indeed, it may be unaware of many claims existing in its favor. When a release provides that "any and all claims," "past, present, or future" are to be extinguished, a court is required to enforce its provisions both as to known and unknown claims. A contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation.

In this case, we are buttressed in our decision by the omnipresence of high level executives and competent counsel throughout the entire business activities. The settlement of the many controversies between these parties was no fly-by-night transaction. After months of wrangling and negotiating the executives of Ingram and McDermott exchanged letters outlining proposed settlement terms. See n. 9, *supra.* This was followed by the formal releases which were drafted by the parties through their skilled and knowledgeable counsel. As the records of this Court reflect, these counsel were not novices at important litigation which must have included experience in contract drafting. Ingram, with its battery of executives and counsel, was not impotent when pitted against McDermott. It is inconsequential and unavailing for Ingram to now assert, years after negotiation and execution of its release contracts, that it did not intend to release antitrust claims. *Redel's,* 498 F.2d at 100.

### III.

*Private Antitrust Enforcement v. Release Agreements: Concepts Operating at Cross Purposes?*

Ingram presses vigorously on us the argument that the national policy of private enforcement of antitrust claims counsels against the operation of a release to quiet the antitrust claims in this case. In its August 14, 1980, Order vacating grant of summary judgment in favor of McDermott, the District Court accorded this argument substantial legitimacy. 495 F.Supp. at 1329. In the abstract, of course, Ingram is quite correct that national antitrust policy favors private enforcement of antitrust claims. We agree, as we must, with the Supreme Court's acknowledgement that Congress was convinced when it enacted the relevant provisions of the Clayton Act that "private antitrust litigation is one of the surest weapons for effective antitrust enforcement of the antitrust laws, . . ." and that § 16(b) (one year tolling of the statute of limitations pending resolution of an antitrust suit brought by the government against a defendant) was enacted "in order to 'assist private litigants in utilizing any benefits they might cull from government antitrust actions.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 336, 91 S.Ct. 795, 805, 28 L.Ed.2d 77 (1971), quoting *Minnesota Mining and Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S.

311, 317–18, 85 S.Ct. 1473, 1476–77, 14 L.Ed.2d 405 (1965); *see also, Lawlor v. National Screen Service,* 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955) (There is a "public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble damage action".)

Yet, the existence of the Clayton Act alone and its related devices to assist an antitrust plaintiff prosecute his claims do not determine the issue of whether an antitrust plaintiff has made sufficient allegations in his complaint to survive properly asserted affirmative defenses and continue prosecuting his action under the statute. A litigant in Ingram's shoes must be able to get beyond defenses which, as a matter of law, serve successfully to terminate his claims.

■ As already stated, our view is that an adequately drawn and validly executed release will bar antitrust claims. *Redel's, supra; Accord: Richards Lumber & Supply Co. v. United States Gypsum Co.,* 545 F.2d 18 (7th Cir.1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977); *Oskey Gasoline and Oil Co., Inc. v. Continental Oil Co.,* 534 F.2d 1281 (8th Cir.1976); *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975); *Schott Enterprises, Inc. v. Pepsico, Inc.,* 520 F.2d 1298 (6th Cir.1975); *Virginia Impressions Products Co. v. SCM Corp.,* 448 F.2d 262 (4th Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972); *Duffy Theatres, Inc. v. Griffith Consolidated Theatres, Inc.,* 208 F.2d 316 (10th Cir.1953) *cert. denied,* 347 U.S. 935, 74 S.Ct. 629, 98 L.Ed. 1085 (1954); *Suckow Borax Consolidated, Inc. v. Borax Consolidated, Ltd.,* 185 F.2d 196 (9th Cir.1950), *cert. denied,* 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951). Ingram's attempt to distinguish these cases on the basis that their facts are different must fail. Ingram finds the cases inapposite because (i) either the releasor was aware of the facts underlying his antitrust claim and signed the releases notwithstanding this knowledge, or (ii) the antitrust plaintiff made no allegations in his complaint as to fraudulent concealment. First, finding its position quite unlike the antitrust plaintiffs in these cases, Ingram maintains that it did not know of its potential antitrust claims. As a consequence, the holdings and rationale of these cases do not apply to them. We have already made clear, however, that mere ignorance of an antitrust claim does not bar its release. *See* discussion ante at p. 1312, section II. Hence, Ingram's first attempt to distinguish these cases utterly fails. Second, in another effort to avoid the import of these decisions, Ingram argues that it did allege fraudulent concealment in its complaint. While this is true, the insufficiency of this so-called distinguishing factor will be shown in the discussion that follows.

### Fraudulent Concealment Allegations

■ Our attention must now center on Ingram's allegation of fraudulent concealment of the antitrust conspiracy by McDermott. Paragraph 44 of Ingram's complaint sets forth all of Ingram's allegations of fraudulent concealment. *See* note 12, *supra.* While on its face this portion of Ingram's complaint alleges that the defendants did not advertise their conduct or make it an industry topic of discussion, it fails to allege the kind of fraud that is sufficient to vitiate the releases. Moreover, the affidavits submitted by high ranking Ingram personnel do not demonstrate that McDermott engaged in the type of fraudulent behavior which would render the releases unenforceable. The affidavits showed that McDermott and Ingram met in connection with the 1971 sale of Ingram's foreign assets to discuss the antitrust implications of the proposed sale. Affidavit of Thomas B. Lemann ¶ 3–5. In fact, Frederic B. Ingram acknowledged that "[a]t the time the Purchase Agreement was negotiated, antitrust considerations were given some weight in our discussions . . .". Affidavit of Frederic B. Ingram, ¶ 9. Deposition testimonies of the Ingram brothers indicate that McDermott never made any misrepresentations to Ingram to induce either the sale of assets or execution of the releases. Thus, the question is whether McDermott fraudulently induced Ingram to enter into the releases. We find the District Court's

initial distinction between fraudulent concealment of an antitrust conspiracy and fraud sufficient to vitiate a release to be the correct way to analyze the dispute.[25]

The difference between these two acts is clear. Few, if any, conspiracies to restrain trade and monopolize an industry before detection will ordinarily be matters of industry-wide or public discussion. The very nature of a conspiracy suggests that it be done in secret and with other parties. One cannot conspire alone. The Sherman Act expressly forbids this kind of behavior; consequently those who do so are not apt to advertise it. When discovered by the government, however, they must pay a heavy price for their misconduct. Government prosecution for antitrust violations is a business person's nightmare and a paramount sanction against an antitrust conspirator. Thus, it is likely that any business which knowingly violates the antitrust laws will do much to conceal its illegal acts for as long a period of time as is possible.

■ Unfortunately, many times antitrust conspirators are successful at concealing their conduct way beyond the four-year statute of limitations. This is why sufficient allegations of fraudulent concealment toll the statute of limitations for an antitrust plaintiff. *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 52 (5th Cir.1974) *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *General Electric Co. v. City of San Antonio,* 334 F.2d 480, 483–84, and cases cited at nn. 8–13 (5th Cir.1964); *Accord: Norton-Children's Hospital v. James E. Smith & Sons,* 658 F.2d 440 (6th Cir.1981); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d at 394; *Weinberger v. Retail Credit Co.,* 498 F.2d 552 (4th Cir.1974); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2nd Cir.1974);

*Public Service Co. of New Mexico v. General Electric Co.,* 315 F.2d 306 (10th Cir.1963); *Kansas City, Missouri v. Federal Pacific Electric Co.,* 310 F.2d 271 (8th Cir.) *cert. denied,* 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962). *But that is all it does.* It gives a plaintiff who has been injured by a defendant's antitrust violations a chance to bring his action outside of the ordinary four-year limitations period. It does *not* allow a plaintiff the opportunity to escape the consequences of his bargain with a defendant to release antitrust claims. We decline to read into the tolling doctrine of the antitrust laws any such curative provision.

■ Fraudulent inducement sufficient to nullify a contract is obviously a different matter. It can vitiate a release. This is hornbook law. See Restatement (Second) of Contracts §§ 164, 167 (1979); 12 S. Williston, A Treatise on the Law of Contracts § 1488 (3d ed. 1970); 37 Am.Jur.2d *Fraud and Deceit* §§ 8, 12 (1968); 37 C.J.S. *Fraud* § 64 (1943). Had Ingram demonstrated that McDermott had somehow duped it into entering the release agreements by some affirmative deceptive act, *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978), at the time of their negotiation, then there would be no question that the release agreements were ineffectual. Indeed the District Court stated that "[t]he releases can be voided by fraud only if during the negotiations McDermott misrepresented material facts or concealed facts which would materially qualify those already stated...." Order of March 19, 1980. The District Court concluded that "Ingram has been unable to present any evidence to support its claim that the 1973 releases are vitiated by fraud." This conclusion is a clear determination that Ingram has never been able to prove that McDer-

**25.** We recognize, of course, that Judge Sear reversed himself on this distinction. However, a careful reading of his third decision of August 14, 1980 leaves us with the definite impression that his vascillation on this issue has more to do with whether it is consistent with the national policy of private antitrust enforcement to allow an antitrust conspirator to escape the punitive effects of the full panoply of the federal antitrust regime than with preserving the necessary distinction between covering up an antitrust conspiracy on one hand, and fraudulent inducement of a party to release its antitrust claims on the other. While the former is sufficient to toll the statute of limitations, it has little, if anything at all, to do with the validity of a release of antitrust claims.

mott misled it in the negotiation of the releases.

Yet, Ingram seems to suggest that it sold its assets because of McDermott's officer's alleged "misrepresentation" that Ingram was losing money because of its small size. Supplemental Affidavit of Frederic B. Ingram, ¶¶ 2–3. Like the District Court, we cannot see how this single and simple statement, standing alone, not again repeated, allegedly made by one sophisticated businessman to another, can constitute the requisite fraudulent concealment of the antitrust conspiracy to void releases which were executed and exchanged nearly two years later. The nexus between this statement and the release negotiations is far too attenuated to be of probative value.[26]

Ingram further contends that McDermott's failure to disclose possible antitrust claims during the release negotiations is evidence of McDermott's fraudulent concealment of the antitrust conspiracy. This cannot be so. Parties bargaining at arms length who are not in a fiduciary relationship with one another are not required to make known all possible claims against one another. *Redel's,* 498 F.2d at 100. McDermott's silence as to possible antitrust claims is not the same thing as fraudulent inducement.

When given opportunities—and several were granted—to present evidence that McDermott fraudulently induced it to enter into the releases, Ingram failed to do so. Out of a total of four separate Orders, the District Judge never found that McDermott fraudulently induced Ingram to execute the releases. In none of the evidentiary submissions before the court was there an indication that McDermott obtained the releases from Ingram through the cunning vice of fraud. There was thus no basis for the district court to arrive at the conclusion that the releases cannot bar Ingram's suit.

The only way that Ingram may have escaped the consequences of its bargain with McDermott would have been for it to prove that the releases themselves were "part and parcel" of an antitrust conspiracy. But the district court flatly rejected this theory each time Ingram asserted it. Orders of January 10, 1980 and March 19, 1980. Under *Redel's* we intimated that another case may someday arise where "the release itself was an integral part of a scheme to violate antitrust laws" and therefore will not be construed to extinguish antitrust claims. *Redel's,* 498 F.2d at 100–101. This case has not ushered in that day. This language in *Redel's* reflects the concept that a release is not valid if the release itself is "part and parcel" of an antitrust conspiracy. See *Dobbins v. Kawasaki Motors Corp.,* 362 F.Supp. 54, 58 (D.Or.1973) *quoted in pertinent part* in *Redel's,* 498 F.2d at 101, nn. 4–5. In his first Order of January 10, 1980, Judge Sear explicitly recognized that McDermott's procurement of the releases was not part and parcel of a conspiracy. He observed that Ingram was out of the marine construction business in 1973, the year the releases were executed.

Thus, the facts demonstrate that the releases were procured after nearly two years of negotiations over disputes "arising from" the sale of Ingram's marine construction business in 1971. This was *after* Ingram had left the business. The releases clearly were not designed to force Ingram out of the business. It already was. Neither were the releases essential to McDermott acquiring Ingram's business. It had already accomplished this. The releases were an outgrowth—a result, not a cause of the acquisition. Ingram made the offer to settle. McDermott accepted. Under these circumstances—unlike those where a party with superior economic power forces unfounded provisions of a release on the other party—Ingram should not be allowed to

---

**26.** The record discloses that both Fritz and Bronson Ingram testified in depositions that they could not recall any misrepresentations made by McDermott which induced them to execute the releases or to sell Ingram's assets. In fact, Ingram acknowledged that the state-

ments he had attributed to Roger Wilson, McDermott's president, concerning the reasons for Ingram's lack of success in the marine construction business were, in fact, true. *See* text accompanying note 24, *supra.*

undermine the provisions of valid releases to which it agreed.

## IV.

*Federal Common Law: Our Guiding Light*

 Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), according to Ingram, should preclude us from following a federal common law rule in interpreting the releases in this case. We disagree. The issue in *Texas Industries* was "whether the federal antitrust laws allow a defendant against whom civil damages, costs, and attorneys' fees have been assessed a right to contribution from other participants in the unlawful conspiracy on which recovery was based." *Id.* at 632, 101 S.Ct. at 2062. The Supreme Court there upheld our decision in *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.,* 604 F.2d 897 (5th Cir.1979), where we concluded that no right of contribution from co-conspirators was available to an antitrust defendant. Agreeing with us that the federal antitrust laws neither explicitly nor implicitly provided for such, the Court determined that the courts need not fashion a common law rule. The Court concluded that this was a matter within the congressional prerogative.

The issue in *Texas Industries* touches on the core of the purpose of the federal antitrust laws which are largely penal in nature. A judicially created right to contribution would have softened the impact of a Clayton Act suit on a defendant—a circumstance we could aptly regard as a "windfall of sorts for [an antitrust] defendant because of the fortuity of plaintiff's proof." *Wilson P. Abraham Construction Corp. v. Texas Industries,* 604 F.2d at 906. When

the practical transformation would have occurred and the consequences of such a decision made clearer, a right to contribution would have amounted to a substantive change in the remedial provisions of the federal antitrust laws. We were not disposed or empowered, absent a clearer indication from Congress or more compelling circumstances than that case provided, to take such a course. Thus, the question was not whether federal, rather than state, common law should apply. The question was whether it was a decision for Congress and not the courts.

But such is not the case here. No such eventuality is forthcoming. Enforcement of a release which covers antitrust claims does not implicate or derogate from the remedial provisions of the federal antitrust laws. Indeed, they remain unaffected by our decision. The government has convicted McDermott for its antitrust violations. Our decision does not in any way affect those convictions. It has nothing whatsoever to do with future violations or future prosecutions. We preempt no government prosecution under the antitrust laws.

Moreover, there is a significant public policy interest in permitting parties to enter into negotiations to settle their differences, *Insurance Concepts, Inc. v. Western Life Insurance Co.,* 639 F.2d 1108 (5th Cir.1981); *Thomas v. Louisiana,* 534 F.2d 613 (5th Cir. 1976), even when these include possible antitrust claims. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 25 L.Ed.2d 77 *supra; Schott Enterprises, Inc. v. Pepsico, Inc.,* 520 F.2d at 1300, *supra; Green v. Valve Corp. of America,* 428 F.2d 342 (7th Cir.1970); *Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 386 F.2d 757 (6th Cir.1967).[27]

---

**27.** We are asked to direct attention to the opinion in *Three Rivers Motor Corp.,* 522 F.2d 885 *supra,* where the Third Circuit chose to apply state law to the general releases there under scrutiny rather than fashion a federal rule. The *Three Rivers* Court posited three factors that should be considered before deciding whether to apply a federal common law rule to an antitrust release or a state law rule: (i) the necessity of adopting a uniform federal rule, (ii) how closely allied is the transaction in question to traditional areas of state regulation, and (iii) the chance that the state rule will undermine the goal of the federal statutory scheme. After discussing these factors, the *Three Rivers* Court decided to follow Pennsylvania law concerning the construction of releases, concluding that: (a) the state rule did not do violence to the federal antitrust enforcement apparatus; (b) a release is a form of contract and state law is traditionally preeminent in the regulation of contracts, and (c) a uniform federal rule was

## V.

### Add State Law Claims for Good Measure

Both parties implore us to reach the pendent state law claims involved in this case. A decision to reach the state claims rests, of course, on an independent examination for the basis of our jurisdiction rather than merely the parties' mutual consent to it. *Matter of Kutner,* 656 F.2d 1107 (5th Cir.1981); *Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888 (7th Cir.) *cert. denied,* 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966).

Given our decision that Ingram has no federal cause of action against McDermott because it is barred by the releases, it is left with the following patchwork of claims. As against McDermott, Ingram has only its

not needed because the parties "may couch the terms of their release agreement in terms compatible with whichever state's law is applicable." *Three Rivers, supra,* 522 F.2d at 890. The Court did observe, however, that "[s]ince this case deals with the operation of a Congressional statutory scheme, the federal courts are competent *to interpret the release without regard to state law." Id.* at 889. (emphasis in original).

We are aware that not all courts and commentators agree that federal law should govern the application of releases to antitrust claims. *See generally* Note, "The Role of State Law in Federal Antitrust Treble Damage Actions", 75 Harv.L.Rev. 1395, 1398–99 (1962) and authorities cited therein. Nevertheless, we do not consider this adequate reason to abandon precedent established by *Redel's,* 498 F.2d 95 *supra.* We see no reason to change our course given the clear direction of courts in applying federal rules to govern releases in other contexts. E.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 *supra* (release of joint tortfeasors in an antitrust suit implicates peculiarly federal interests); *Aro Manufacturing Co. v. Convertible Top Co.,* 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (federal law governs release in patent infringement cases); *Dice v. Akron, C. and Y.R.R.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952) ("validity of releases under the Federal Employers' Liability Act [FELA] raises a federal question to be governed by federal rather than state law"); *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942) ("the constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded them by the jurisdiction in which the right itself originates.") (Jones Act); *Miami Parts and Spring,*

state law claims and no federal claims. As against Brown & Root, Ingram's federal cause of action survives but it has no state law claim. Thus, as between Ingram and McDermott, the only claims surviving are those under state law. We are now faced with the decision of (i) whether to allow the district court to retain jurisdiction of Ingram's pendent state claims, (ii) or to remand with directions to the district court to dismiss the pendent state law claims because there is no independent basis of federal jurisdiction, (iii) or to reach the merits of the state cause of action on appeal and thereby put an end to the entire litigation between these parties. We must first, however, look for guidance in order to arrive at a fair and just conclusion.

*Inc. v. Champion Spark Plug,* 402 F.2d 83 (5th Cir.1968) (federal rather than state law governs effect of a release in federal antitrust action); *Cates v. United States,* 451 F.2d 411 (5th Cir. 1971) (following rule laid down in *Zenith* on cases involving the release of seamen in admiralty); *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.,* 558 F.2d 1113 (2d Cir. 1977) ("federal law governs all questions relating to validity of and defense to purported releases of federal statutory causes of action"); *Stella v. Kaiser,* 221 F.2d 115 (2d Cir.), *cert. denied,* 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955) (opinion of L. Hand and J. Frank) (federal question raised in the release of a party in a suit brought under the Securities Exchange Act); *Hilton v. Triangle Publications, Inc.,* 198 F.Supp. 638 (S.D.N.Y.1961) ("since the jurisdiction of the court is predicated on a federal question then federal law must determine all problems arising in the litigation.").

*Zenith,* of course, is ample authority for us to rest our decision. *Zenith* intimates that a release which implicates a federally created statutory claims should be construed in light of a single federal rule rather than by application of various state rules. The virtue of a federal rule is certainty and predictability. The parties to a release would not be required, as *Three Rivers* suggests, to draft their contract in accordance with whichever state's law applies. Consequently, unlike the *Three Rivers* Court, we consider the effect of a uniform federal rule to be neither insubstantial nor having "little utility", 522 F.2d at 890, but of such importance as to be preserved and followed within our circuit. Thus, we cannot either so craftily distinguish *Zenith* or so lightly set aside precedent in *Redel's.*

To this day, the prime authority on pendent jurisdiction of state law claims remains *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In *Gibbs,* the plaintiff complained that union conduct which damaged his business was both an illegal secondary boycott within the meaning of federal labor legislation and the tortious interference with his contract rights sounded a claim under state law in Tennessee. The Supreme Court held that because the district court had jurisdiction over the federal issue, it was also authorized to decide the state tort law claims. The Court observed that pendent jurisdiction "in the sense of judicial power, exists whenever there is a claim 'arising under the Constitution, the Laws of the United States, and Treaties made ... under their Authority ...', and the relationship between that claim and the state permits the conclusion that the entire action before the court comprises but one constitutional 'case'". *Id.* at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 227.

The Court then established three prerequisites that had to be satisfied before a federal court was to exercise pendent jurisdiction over a litigant's state law claims. First, the Court noted that the federal claim "must have substance sufficient to confer subject matter jurisdiction on the court." *Id.* Second, the state and federal claims must derive from a common nucleus of operative fact. *Id.* Finally, the Court observed that if the state and federal claims are considered without regard to their particular character, and they are still of such a nature that one would ordinarily expect them to be tried all in one judicial proceeding, then "assuming substantiality of the federal issues there is *power* in the federal courts to hear the whole." *Id.* (emphasis in original).

We would perhaps be content to make our decision based on this tripartite inquiry alone if it were not for the subsequent caveat the Court registered. The Court emphasized that the *power* to hear the whole need not be asserted in every case. In now very famous words, the Court declared that the exercise of pendent jurisdiction is justified only when judicial economy, convenience and fairness to the litigants are present in a case. *Id.* at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228. Furthermore, in words difficult to misunderstand, the Court stated:

> Needless decisions of state law should be avoided, both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, *if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Id.* (notes omitted.) (emphasis supplied.)

As a matter of historical fact, the Supreme Court in *Gibbs* upheld the district court's decision to reach the pendent state claims. It should be pointed out, however, that the district court in *Gibbs* exercised its pendent jurisdiction only after there had been a trial on the merits of the federal issue. This is not the case here, however, where there has been no trial on the merits of either the federal or state claims. *Gibbs* would thus seem to preempt any consideration of the state law claims when there exists no independent basis of federal jurisdiction and this determination has been made before a trial has been conducted on the merits of either set of claims.

The cases thus speak with a single voice on what a court is to do with pendent state law claims when the litigant's federal cause of action has been dismissed at a preliminary stage. *Morgan v. Odem,* 552 F.2d 147, 149 (5th Cir.1977) (per curiam) ("Without allegations sufficient to state federal causes of action, the complaint as to Louisiana state claims was appropriately dismissed."); *Scranton Construction Co., Inc. v. Litton Industries Leasing Corp.* 494 F.2d 778, 783 (5th Cir.) *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1974) (after entry of summary judgment against the plaintiffs on federal antitrust claims, "the court below properly dismissed plaintiffs' pendent state ... claims...."); *Accord: Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607,

616 (8th Cir.1980) ("Where the federal element which is the basis for jurisdiction is disposed of early in the case, as on the pleadings, it smacks of the tail wagging the dog to continue with a federal hearing of the state claims") *quoting McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424, 427 (2d Cir.1965); *Rogin v. Bensalem Township,* 616 F.2d 680 (3rd Cir.1980) *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Ancarrow v. City of Richmond,* 600 F.2d 443 (4th Cir.) *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *Federman v. Empire Fire and Marine Insurance Co.,* 597 F.2d 798, 809 (2d Cir.1979) ("Dismissal of the state claim is the recommended procedure if state issues predominate or jury confusion is likely due to divergent legal theories, and in cases where the federal claim is disposed of prior to trial."); *Nemkov v. O'Hare Chicago Corp.,* 592 F.2d 351, 353, n. 1 (7th Cir.1979) ("Since the federal law claims had been disposed of at the outset of the case, the court properly dismissed the pendent state law claims."); *Hodge v. Mountain States Tel. and Tel. Co.,* 555 F.2d 254 (9th Cir.1977) ("When a district court dismisses all federal claims prior to trial, it should not retain jurisdiction over pendent state claims.") *REA Express, Inc. v. Travelers Insurance Co.,* 554 F.2d 1200 (D.C.Cir.) *cert. denied,* 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977); *Kurz v. State of Michigan,* 548 F.2d 172, 175 (6th Cir.) *cert. denied,* 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462 (1977) ("Since all portions of the claims on this cause of action which arise under federal law have now been dismissed, the state law claims are no longer pendent and must be dismissed likewise."); *Randall v. Goldmark,* 495 F.2d 356 (1st Cir.) *cert. denied,* 419 U.S. 879, 95 S.Ct. 144, 42 L.Ed.2d 119 (1974).

The general rule is not absolute, however. A number of decisions have attempted to reconcile important considerations of state and federal comity with equally weighty concerns of judicial economy, convenience, and fairness—all cornerstones of the pendent jurisdiction doctrine. The Supreme Court has wrestled with these oft-times divergent goals. In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), Justice Harlan, speaking for the Court with the precise mix of allegiance to legal precedent and important policy considerations, stated

> We are not willing to defeat the commonsense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.

*Id.* at 405, 90 S.Ct. at 1214, 25 L.Ed.2d at 451.

We, too, have indicated our reluctance to take an unbending approach to pendent jurisdiction questions for fear that such conceptual rigor would achieve undesirable ends and ensconce valid considerations of judicial economy, convenience, and fairness to litigants behind a suffocating veil. *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996 (5th Cir.1974) *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975). *Hudak* was a case where all of the parties to the controversy were residents of Florida. The plaintiff's federal cause of action under the securities laws was barred by the statute of limitations; however, this Court held that the plaintiff's state cause of action for common law fraud was cognizable in federal court by the exercise of pendent jurisdiction. *Id.* at 1001. *Hudak* is virtually indistinguishable from the case at bar. Adopting the language and rationale of the Seventh Circuit, this Court stated:

> [c]ertainly judicial economy directs that we dispose of the issues here instead of sending the case back to the district court with directions to dismiss [the state law counts] and virtually sending the plaintiffs to the state court where it is likely that the case would go through the trial and appellate courts. The parties would be greatly inconvenienced by having to retry the issues. It also would be unfair to the parties, who have litigated the issues in a . . . trial in the district court and filed briefs and argued here, to have us refrain from disposing of [the state

law counts] after passing on the judgment with respect to the other counts, especially in view of the "federal judicial resources" already committed.

*quoting, Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123, 129 (1972).

■ It is beyond peradventure that considerations of judicial economy, convenience and fairness to litigants all militate in favor of the exercise of pendent jurisdiction in this case. No one even remotely connected with this litigation—the parties and their legal representatives, or judicial officers—doubts that the traditional justifications for invoking pendent jurisdiction over state law claims are overwhelmingly present in the instant case. In light of this, we think that judicial economy, convenience and fairness to litigants—the hallmarks of the pendent jurisdiction doctrine—are better served if we ourselves proceed to reach the merits of the state law claims.[28]

■ In an effort to salvage its state law claims, Ingram argues that the releases must be interpreted in light of Article 3073 of the Louisiana Civil Code which has been interpreted to allow parol evidence to be introduced in order to determine the intent of the parties to a release. *Morrow v.*

*American Bank and Trust Co.,* 397 F.Supp. 803 (M.D.La.1975), *aff'd without opinion,* 547 F.2d 309 (5th Cir.1977); *Moak v. American Automobile Insurance Co.,* 242 La. 160, 134 So.2d 911 (1961); *Webb v. Sonnier,* 272 So.2d 778 (La.App. 3d Cir.1973); *Volkswagen Insurance Co. v. Bishop,* 231 So.2d 465 (La.App. 2d Cir.1970); *LeBlanc v. Brou,* 205 So.2d 141 (La.App. 1st Cir.1967). *American Metal Window Co. v. St. Tammany Parish School Board,* 183 So.2d 667 (La. App. 1st Cir.1966). Article 3073 states:

Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.

The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.

McDermott counters essentially with assertions that (i) Article 3073 must be read in the context of the present dispute which is between two commercial parties with

---

**28.** Our authority to reach the state law claims on appeal is clear. *See Hudak, supra.* Moreover, the state law claims are quite properly before us. The district court denied McDermott's motion for summary judgment on Ingram's state cause of action. *See* Order of January 10, 1980. The state cause of action involves the interpretation to be given the releases in light of the state law. We have already interpreted the releases with regard to the federal cause of action. In very substantial measure, the interpretation question has been fully litigated in the court below and was extensively briefed on appeal. The contractual documents in dispute, the pleadings, and numerous affidavits tending to throw light on the meaning of the releases are all in evidence. All of these legal materials were before the district court. A decision adverse to McDermott on both the federal and state causes of action was rendered by the district court. There can thus be little doubt that we are free to go to the merits of Ingram's pendent state claims on this appeal. *Id.* at 1001. (answering affirmatively to the question whether, after determining that the federal claim should have been dismissed preliminarily the appellate court should pro-

ceed to review the district court's holding on the pendent state claim); *Connecticut General Life Insurance Co. v. Craton,* 405 F.2d 41, 49 (5th Cir.1968); *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *Trent v. Atlantic City Electric Co.,* 334 F.2d 847, 864 (3rd Cir. 1964) ("Inasmuch as the resolution of the issue should have been determined solely by reference to the contract, this court is just as competent to decide the question as would have been the court below."); *In re Barnett,* 124 F.2d 1005, 1009 (2d Cir.1942) ("in disposing of a case before it, an appellate court has a broad power 'to make such disposition * * * as justice requires.' ") Hence, ample authority exists to reach the pendent state claims. Consequently, it unnecessary to discuss any alternative theory for our power to act on the state law issues such as pendent *party* jurisdiction. For an expansive discourse on pendent *party* jurisdiction see *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Boudreaux v. Puckett,* 611 F.2d 1028 (5th Cir.1980); *Florida East Coast Railway v. United States,* 519 F.2d 1184 (5th Cir.1975).

equal bargaining power and (ii) Article 3073 must not be construed to nullify the effect of Article 2276 of the Louisiana Civil Code which reads:

> Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.

and Article 3083 which reads:

> When parties have compromised generally on all the differences, which they might have had with one another, the titles which they then know nothing of and which were afterwards discovered, are not a cause of rescinding the transaction, unless they have been kept concealed on purpose by the deed of one of the parties.

and (iii) Louisiana courts have declined to admit parol evidence when the release or other contract or settlement agreement is complete on its face. *LeJeune v. Midwestern Insurance Co.,* 98 F.Supp. 863 (W.D.La. 1951); *Felder v. Georgia Pacific Corp.,* 393 So.2d 394 (La.App. 1st Cir.1980) *aff'd,* 405 So.2d 521 (La.1981); *Cassidy v. Joseph,* 204 La. 664, 16 So.2d 225 (1943); *Misuraca v. Metropolitan Life Insurance Co.,* 199 La. 867, 7 So.2d 167 (1942); *Landry v. Faulkner,* 417 So.2d 1376 (La.App. 4th Cir.1982); *In re Teddlie,* 385 So.2d 902 (La.App. 2d Cir.) *cert. denied,* 393 So.2d 742 (La.1980); *Brian Investments, Ltd. v. Ascantia, Inc.,* 381 So.2d 1275 (La.App. 4th Cir.) *cert. denied,* 385 So.2d 275 (La.1980); *Hicks v. Fidelity-Southern Fire Insurance Co.,* 251 So.2d 526 (La.App. 1st Cir.1971); *Tschirge v. Land-O-Lakes Developers,* 98 So.2d 270 (La.App. 1st Cir.1957).

Both parties are correct. Only one can prevail. McDermott does.

Article 3073 expressly states that transactions regulate only those differences which appear to be comprehended in them by the party's intention, "*unless it be the necessary consequence of what is expressed.*" (emphasis supplied). We stated earlier in this opinion that the releases apply to those claims which arose out of the sale of Ingram's assets, i.e., leaving the marine construction industry. And the reason for the sale of its assets, Ingram says, was due to the antitrust conspiracy between the defendants. Thus, even if, as Ingram alleges, it did not intend to release antitrust claims, the clear language of article 3073 renders this inconsequential. The releases must cover antitrust claims because such is the "necessary consequence of what is expressed" in them.

More than this, Ingram's argument would require that we simply close our eyes to the parol evidence provision of the Louisiana Civil Code, Article 2276, which forbids such evidence. Under Louisiana law, and especially the specific releases here, parol evidence is not permissible. The Louisiana courts have often held that the plain language of a release cannot be evaded by parol evidence of the intent of the parties. *See Tschirge,* 98 So.2d at 273, where the court held that

> As to plaintiff's claim that he should have been allowed to introduce testimony to offset the compromise we can conceive of no such testimony which would have been admissible into evidence. Certainly he could not have taken testimony to contradict his written contract, or to show the intent of the parties when said intent was clearly set forth in the document itself.

*Accord: Felder,* 393 So.2d at 395 ("the release is complete on its face and no parol evidence can be admitted to vary the terms."); *Brian Investments,* 381 So.2d at 1278 ("legal agreements have the effect of law upon the parties, and the courts are bound to give legal effect to such contracts according to the intent of the parties as determined by these clear words."). The words of a written compromise agreement, and not the unspoken intention of one party, determine the meaning of a release which in this context serves as a relinquishment of all claims, a settlement and an end to the dispute between the parties. And it is well settled in Louisiana that "compromise and settlements of litigation are well favored by the law and jurisprudence." *Mongrue v. State Farm Mutual Automobile Liability Insurance Co.,* 396 So.2d 466, 468

(La.App. 4th Cir.1981); *see also* In re: *Teddlie, supra.*

█ Furthermore, Ingram fails to take into consideration Article 3083 which precludes it from rescinding the releases on the questionable basis that it discovered the claims five years later. True, the same article provides that the contract may be rescinded if the potential claims had been "concealed on purpose by the deed of one of the parties." First, we observe in that regard that Ingram has not directed us to a single case, state or federal, which has applied that clause of Article 3083 to nullify an otherwise valid release. Second, the court below failed to even take notice of this provision. Third and more important, we think, the Louisiana cases hold that an unknown claim is not ample ground to avoid the terms of a release, *Shell Oil v. Kennedy,* 344 So.2d 1153 (La.App. 4th Cir. 1977); *Hicks v. Fidelity-Southern, supra,* especially when a party has no legal duty to disclose claims the other side might conceivably have against it. *Redel's, supra, Virginia Impression Products, supra.*

Finally, we find it important to stress again that at the time the releases were negotiated the parties to this dispute were three major forces within the marine construction industry. Their assets were worth millions. Their counsel were among the finest the legal profession could offer. They were corporations staffed by high level executives whose knowledge about the nuts and bolts of the marine construction industry was substantial. Neither was a novice. Neither was so. incompetent as to be without means of discovering possible antitrust violations. Neither was, or if it was, it should not have been, so convinced of the other's business integrity to justify failure to inquire as to the possibility that the releases would cover antitrust claims.[29] And from the looks of it, neither was above conspiring to violate the antitrust laws. Given these facts, we doubt that the Louisiana courts would take a different view of this case, especially in light of Louisiana's well recognized doctrine that compromises and settlements between arms-length parties are favored in the law. *In re South Central States Bakery Products Antitrust Litigation,* 88 F.R.D. 641 (M.D.La.1980); *Mongrue v. State Farm Mutual Automobile Liability Insurance Co.,* 396 So.2d 466 (La. App. 4th Cir.1981); *In re LaHaye,* 361 So.2d 1351 (La.App. 3d Cir.1978); *Zadeck v. Arkansas Louisiana Gas Co.,* 338 So.2d 303 (La.App. 2d Cir.1976). Due to its unmistakably important position in the marine construction business in 1971, Ingram cannot look back on its undeniably protracted negotiations with McDermott, which resulted in the execution of releases that extinguished all claims "arising out of, based upon, or any way relating to" its untriumphant exit from the marine construction business, and yell "foul play, release me from the bane of the releases." Cf. *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 186, 92 S.Ct. 775, 782, 31 L.Ed.2d 124, 134 (1972). We cannot and will not allow this result.

## VI.

### *Caution Yes, Preclusion No*

█ We are mindful of the caution with which a court is to approach granting summary judgment in an antitrust suit. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Additionally, however, we are convinced that summary judgment is not to be all together disallowed in antitrust cases. *First National Bank v. Cities Service Co., supra; Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); *Little John v. Shell Oil Co.,* 483 F.2d 1140, 1145 (5th Cir.) (en banc) *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *Golden v. Kentile*

---

**29.** We find it noteworthy that the parties' counsel had a meeting in 1971 to discuss the implications of the antitrust laws on Ingram's sale of assets to McDermott. This meeting should have at least demonstrated to Ingram that antitrust was not a foreclosed topic for discussion in negotiation of the releases in 1973. *See* text accompanying note 25, *supra.*

*Floors, Inc.,* 475 F.2d 288 (5th Cir.1973); *A & M Stores, Inc. v. Hiram Walker, Inc.,* 427 F.2d 167 (5th Cir.1970) (Per Curiam); *Island Enterprises, Inc. v. Ketchikan Pulp Co.,* 614 F.2d 776 (9th Cir.1980) (unpublished opinion) (summary judgment permissible because plaintiff claims were barred by release). In our view, this case is a perfect candidate for that procedural device, not because the plaintiff's underlying antitrust claims present no internal issues of contested fact, but because the plaintiff released by contract all possible meritorious claims which includes antitrust claims. We see no reason for the District Court to allow this case to go to trial where the settlement between the parties has foreclosed the claim.

## VII.

### *Conclusion and Famous Last Words*

Believing as we do that the interpretation of a release on its applicability to federal antitrust claims is the province of federal law, we hold that state law to the contrary must defer. We reiterate that where (i) the provisions of a release admit of no ambiguity or the language in it is unmistakably clear, (ii) the specific nature of the release is evident on its face, (iii) and it is shown that the release was entered into voluntarily between parties of substantially equal bargaining power, represented by competent and knowledgeable counsel throughout the release negotiations, (iv) and the releases are not an integral part of a scheme to violate the antitrust laws, (v) and it is not otherwise proven defective, the release may be used as a defense to bar antitrust claims.[30] Since we conclude that the releases extinguish Ingram's claims against McDermott, as a matter of law, we reverse the District Court's denial of McDermott's motion for summary judgment and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.

---

**30.** The releases also bar the RICO claims.